BAUMAN vs. BAUMAN.

In decrees for divorce, and the orders to be made touching the care of the children, and the alimony and the maintainance of the wife, there is no discrimination in the statute (*Dig, ch.* 58,) between divorces *a mensa et thoro* and *a vinculo matrimonii;* and the wife is entitled to alimony both *pendente lite* and permanent, on either kind of divorce.

The section of the statute allowing alterations to be made in whatever provision might have been made touching the alimony allowed the wife, is applicable to divorces from the bonds of matrimony as well as from bed and board.

In the exercise of jurisdiction of matters of divorce the Chancery Courts ought to employ the same rules of law which the Ecclesiastical Courts do, except when they are unsuited to our Courts, or in conflict with constitutional or statutory provisions, or the general spirit of our laws.

A wife who has obtained a decree for divorce cannot by bill, or a proceeding in the nature of a bill of review, procure an alteration in the original decree on the ground that any allowances therein made her were inadequate: Her remedy was by appeal from the original decree.

A Court of Chancery in estimating the allowance to be made the wife, *pendente lite,* on a bill for divorce, will take into consideration her expenses to be incurred during the progress of the suit; and where an allowance has been made her, it will be presumed that her counsel's fee was considered in fixing the amount.

A summary application to the Court is sufficient, under the provisions of the statute for enforcing decrees in such cases, to afford the wife relief where her allowance is in arrears, without a bill for that purpose.

*Appeal from the Circuit Court of Pulaski county, in Chancery.*

Hon. WILLIAM H. FEILD, Circuit Judge.

PIKE & CUMMINS, for the appellant.

From the nature of the subject, it would seem impossible to err in respect to the intention, and scope and extent of the provision of the statute (*sec.* 12, *ch.* 58, *Dig.*,) authorizing alterations in the allowance of alimony. See *Miller vs. Miller,* 6 *J. C. R.* 93.

In England, the matter of alimony, whether temporary or *permanent,* is always subject to modification according to the varying circumstances, in the sound discretion of the Court, upon a view of all the facts. *Poynter on Mar. and Div.* 264 *to* 270, *and cases cited*; *Rogers vs. Vines,* 6 *Iredell* 393; 2 *Barb. Sup. C. R.* 377.

The duty of the husband to support the wife during life, seems in no respect to be affected by the provisions of law, allowing divorces, a *vinculo matrimonii.* 1 *Bl. Com.* 442. Even where the divorce results from the fault of the wife. *Ib.* 441; *N.* 34; *McQueen on Hus. and Wife* 213.

Under our law nothing is left to inference, in respect to alimony—so far as it might be supposed to be affected by a difference between our law, authorizing a divorce *a vinculo,* and the English law, which held the contract indissoluble. *Secs.* 8, 10, 11 *and* 12, (*Dig. ch.* 58), expressly provide for such alimony, and the means of enforcing its payment.

No distinction can be drawn between the provisions for alimony and the remedies for enforcing it, where a divorce *a vinculo* is granted, and a case where permanent separation a *mensa et thoro* is decreed. In both cases, a continuing duty is recognised.

In the amount of alimony allowed, the courts are governed by the estate of the husband. 2 *Dessau.* 45; 4 *ib.* 165; 3 *Paige* 267; 10 *ib.* 26; 4 *Hen. & Munf.* 515; 6 *J. C. R.* 93.

But this proposition needs no citation of authority to sustain it. 7 *Hill* 207; 1 *Barb. Ch. R.* 77; 7 *Hump.* 440; 5 *Day* 352.

A sum will always be allowed to enable wife to employ counsel and pay costs. This is a *necessary*, which the husband is bound to furnish. It stands on the same footing as a mere support. Without it, wife could never have justice done her, but would be forced to submit to perpetual wrongs of her husband. 1 *J. C. R.* 108, 374; 6 *J. C. R.* 91; 4 *Paige* 516; *Poynt. on Marr. & Div.* 247, 250, 258, 259, 260; *Bissell vs. Bissell,* 1 *Barb. S. C. R.* 420; 8 *B. Monr.* 50; 1 *Barb. Ch. R.* 241; 2 *Barb. Ch. R.* 72, 75; 3 *ib.* 628; 2 *Barb. S. C. R.* 480; 8 *Ben. Monr.* 50; and other authorities before cited.

S. H. HEMPSTEAD, for the appellee.

Mr. Justice SCOTT delivered the opinion of the Court.

This cause was brought here by appeal from the Chancery side of the Pulaski Circuit Court.

The bill was filed the 29th day of July, 1852. It recited that, on the 19th of September, 1849, the appellant filed her bill for divorce, alimony and other relief against her then husband, the appellee. That afterwards, she filed an amended and supplemental bill, bringing in another party, to whom the husband had made fraudulent conveyances of his property to defeat her suit, and to have a receiver appointed to take charge of the property. That service was had. That the appellee answered, and filed a cross bill, which was answered, and issue formed. That the supplemental bill was also answered, and issues formed. That upon reference to the master, the 11th August, 1851, to ascertain the value of the appellee's possessions, he reported that he had improved property in the city of Little Rock, valued at $3,500;—unimproved lots, valued at $1,100—household furniture, valued at $197 78, and cash in hand to the amount of $5,000. That there was then due the appellant, on account of alimony *pendente lite,* $43 75; and that from the 1st of January, 1851, she had supported Edwin, the minor son of the parties, at an expense of $75, up to the time of the report. That the causes upon the bills and cross bill were the same day heard and determined, and the Court decreed:

1st. A dismissal of the cross-bill.

2d. That the bonds of matrimony should be absolutely dissolved.

3d. That the conveyances of property made by appellee to Lincoln, should be canceled, and the titles thereof re-invest in the appellee.

4th. That appellee should pay appellant the $43 75, balance of alimony *pendente lite;* also, the $75 already incurred for support of the child; the further sum of $150 per annum for the further support of the child, so long as he should remain in the charge and control of the appellant; and that from that day the appellee should also pay her every year during her natural life $250, in quarterly payments, with interest at 6 per cent. on all such not paid at maturity.

5th. That all of said sums should be created a lien upon the whole property of appellee.

6th. That a receiver, Hutchings, be appointed to take charge of the property and manage it; sell the personal property, and out of the proceeds of the sale and rents pay costs, taxes, and necessary repairs, as well as said allowances, and the future amounts to accrue for the support of the child, and for the alimony decreed—the said support in monthly payments, and the alimony in quarterly.

7th. That the lien so fixed might be discharged, and the property restored to the possession of the appellee, upon his giving bond and approved security to make the payments according to the decree.

It is further alleged that the bond had never been given or offered, and that the appellee had absconded beyond the limits of the State with his money. That the real estate still remains in the hands of the receiver. That he had sold the personal property for $180 18 net, and had managed the real estate to the best advantage, expending of the proceeds only what was necessary for taxes and repairs, and that on the 17th July 1852, he had filed his report, which had been confirmed, whereby it appears that there was due her, up to that date, for the support of her son and for her alimony, $163 33, besides interest, while

there was a balance in the receiver's hands of only $15 92, which was covered by demands upon the property. That the income of the property was insufficient to pay its necessary expenses, and the sums coming to her under the decree, and that only by a sale of the property could she ever be paid. That ever since the decree she had entirely supported her son out of her own means. That the allowance made to her for that purpose was meagre in the extreme, and as he increases in age will be less and less sufficient to educate and bring him up. That extraordinary expenses, then recently incurred by his severe illness, ought to be allowed out of the property in question. That the allowance to her by the decree was equally meagre, barely furnishing subsistence, if promptly paid, leaving her wholly without means of giving her counsel compensation for their services in prosecuting and defending the aforesaid suits, as well as this one, amounting in all, as reasonably she supposed, to $300, which she submits and insists is a just charge against the appellee, who ought to be compelled to pay the same out of the property now in the hands of the Receiver: concluding with prayer that the decree be carried into effect and full execution, and to that end that said real estate be sold: that out of the proceeds, in lieu of said allowances, a gross sum be paid to her equal to these annuities: also, that reasonable attorney's fees, as well as the expenses incurred in the sickness of her son, be paid out of said proceeds; and for general relief.

Upon proof of publication, a decree *pro confesso* was taken, on the 9th of July, 1853, and upon reference to the master for that purpose, he reported, on the 12th of December following, that a reasonable allowance for attorney's fees in the former suits would be $300, and in the case now before the Court $50.

On the 8th February, 1854, the Court took up the case, and holding that the appellant was not entitled to the relief prayed, dismissed her bill, and she appealed.

In the various provisions of our statute, there is a great blending of the two kinds of divorce—*a mensa et thoro* and *a vinculo matrimonii*, which, in the English law, were quite distinct. Perhaps, such may be the legitimate result of the wear of public

sentiment, enlightened by the experience of centuries. That all marriages, lawfully entered into, should be indissoluble, was perhaps, one of the extremes to which the human mind has a tendency to go. Such a sentiment, however, may be greatly excused when the obvious mischiefs are considered, which must inevitably ensue upon the wearing of the matrimonial obligation loosely. And yet, common sense could but revolt at compelling a woman, clear of fault, to cohabit with a man who might be seeking her life, or was openly living in adultery with another woman. Nor could such a wife be without just sympathy, who had been basely deserted by her husband, and left to her daily toils for the support of herself and her lawful offspring. For the latter ill, this well-grounded sympathy produced the very inadequate remedy of a suit for the restitution of conjugal rights. For the former, the still more inadequate one of a divorce *a mensa et thoro*—a compromise, a sensible writer says, " between good sense and good doctrine, which is but a demoralizing mock-remedy for matrimonial ills:" and which Lord Stowell condemns, because it " casts out the parties in the undefined and dangerous character of a wife without a husband, and a husband without a wife:" and which judge Swift says, " places them in a situation, where there is an irresistible temptation to the commission of adultery, unless they possess more frigidity, or more virtue, than usually falls to the lot of human beings;" and in the language of Mr. Bancroft " punishes the innocent more than the guilty."

So early as the reign of Edward the VI of England, the evils of this extreme sentiment, and the inadequacy of these remedies were felt; and a commission of ecclesiastics appointed to enquire into the subject, reported to the crown, as the result of their deliberations, the opinion that "in cases of adultery, malicious desertion, long absence, or capital enmities, the marriage should be dissolved, with liberty to the injured party to marry again; and that the remedy of divorce *a mensa et thoro* should be entirely abrogated and done away."

But the changes thus proposed were not adopted; it is said, however, "not from any want of confidence in their utility, but

in consequence of a series of disasters, the principal one of which was the death of the King." (*Bishop on Mar. and Div. sec.* 278.) In that country, proverbial for cautious legislation, the law on the subject has not since been materially changed. And the result is said to be, that " second marriages without divorce, and adulteries and the birth of illegitimate children are of every day occurrence, and that the crime of polygamy is winked at, although a felony upon the statute book." (*Ib. sec.* 285.) It is true that divorces from the bond of matrimony are sometimes had in that country, on application to Parliament; but in rare instances only, and at enormous expenses,—some three or more thousand dollars—quite beyond the ability of the mass of the people.

The effect in most of the States of this Union has been to lessen these evils, by removing some of the difficulties in the way of procuring divorces from the bonds of matrimony. The legislation, however, has been extremely various, the laws of scarcely two States being precisely alike. " In most of them, judicial divorces from the bonds of matrimony are allowed for adultery, and in many of them, for a considerable number of other causes; while divorces from bed and board are allowed in a portion of them, and in another portion, they are unknown." *Ib. sec.* 279.

In this State, so thoroughly have these barriers to divorce from the bonds of matrimony been removed by legislation, that but little scope is left for divorces from bed and board, save only in the option of a party, who, proceeding for redress, might prefer this to a final separation, in the hope *of reformation* and ultimate reconciliation. The causes enumerated in our statute, (*Dig. ch.* 58, *sec.* 1,) which authorize the one kind of divorce, equally authorize the other; and they, in the aggregate, are apparently broad enough not only to cover the ground of the ecclesiastical suit for the restitution of conjugal rights—which seems never to have been used in any of the States—but also the whole of that upon which divorces from bed and board were granted; and indeed goes beyond both; because, as was held in *Rose vs. Rose,* 4 *Eng. R.* 507, the fifth cause of divorce specified

in our statute gives to our Courts a broader jurisdiction than that exercised by the Ecclesiastical Courts for *legal cruelty:* since " the intolerable condition contemplated by the statute need not go the full extent of rendering it *impossible* to discharge the duties of the married life, as legal cruelty did in contemplation of law: but to the extent only of rendering it *improper*, for reasons which the public wisdom approves, to require or compel the performance of those duties, under such continuous, extreme and unmerited suffering." *Ib. p.* 516, 517.

But it is not only in the section of our statute above cited, that these two kinds of divorces are blended; in all the others, they are so; except that in the second section relating to the legitimacy of children, where divorces from the bonds of matrimony must necessarily be implied; and in the 6th and 13th sections that kind of divorce is expressly referred to—the one section requiring twelve months residence within this State, unless the injury complained of was committed here, as a pre-requisite for the filing of the bill; and the other re-vesting in the wife all the property, undisposed of, she may have brought into the marriage. In all the provisions touching the proceedings to be had, with the exception just pointed out, and relating to the decree to be rendered, and the orders to be made touching the care of the children, and the alimony and maintenance of the wife, both *pendente lite* and permanent, there is no discrimination in the language employed. Hence, according to rules of construction of common application, the legislature must be understood as intending to discriminate between these two kinds of divorce, no farther than they have expressed in the language of the act, or is necessarily to be implied therefrom when considered in reference to the subject matter.

And if we leave the letter, and go into the spirit of the law, the light thrown upon our path by the history of this matter, at which we have rapidly glanced above, and the course of legislation, both in England and in the greater number of the sister States, our conclusion will not be different.

In England it was by no means unusual for Parliament to require the husband to make a settlement upon his wife, as a

condition of the legislative divorce from the bonds of matrimony, (2 *Bright's Husb. and wife sec*. 15, *p* 368.) And in many of the States either alimony, or something in the name of alimony, although differing in its legal nature, as known in the ecclesiastical law—as a fair division of the property *in specie*—is allowed to be decreed to the wife upon the dissolution of the bonds of matrimony. And in others of the States, in addition to alimony, the wife is allowed, as in this State, whatever property, remaining undisposed of at the filing of the bill, she may have brought into the marriage.

And the practical effect of construing the several sections, relating to permanent alimony and maintenance, to apply exclusively to divorces from *bed and board,* would be, to offer a premium for that kind of divorces, which, as has been seen, it was the policy of the general course of legislation on this subject to diminish; while, at the same time, it would turn over to the charity of friends, or "turn out to prostitution and starvation" every woman divorced from the bonds of matrimony, who had brought no property in the marriage, or whose property may have been wasted by her husband, although his own might remain. Besides, it would be in the face of the general understanding in this State, as shown by the general course in the Courts for many years past. We conclude, therefore, that under our laws the wife is entitled to alimony, both *pendente lite* and *permanent*, as well when divorced from the bonds of matrimony, as from bed and board.

It has been suggested, however, that the 12th section of the act which authorizes " the Court, upon application of either party, to make such alterations, from time to time, as to the allowance of alimony and maintenance, as may be proper" ought to be held as applying exclusively to *divorce from bed and board:* inasmuch as, when the parties are divorced *a vinculo,* whatever hung upon the *vinculum* thus snapped, ought to fall with it. It doubtless was the theory of alimony, as that provision was administered in the spiritual Courts, that the wife received it *as wife,* and that it was from the husband as such; and that it ended when the relation of husband and wife ceased. But in this

respect, the provision made for the wife by the statute, on the divorce a vinculo, although under the name of alimony, is different in its nature; essentially, however, its nature is the same, because, it is still a maintenance for her, growing out of the obligations of the marriage, which the legislature has allowed to be dissolved on this condition.  Or, perhaps more accurately to speak, the legislature has permitted the marriage status of the party to be annulled by a judicial sentence, upon the condition annexed, that so much of the contract, out of which it grew, as shall secure the wife the maintenance provided, shall remain in force.  The power of the legislature to do this cannot be questioned, although the particular mode of securing this maintenance may be objected to as inconvenient.  It was a matter, however, of legislative discretion, which, in different States of the Union, has been exerted in the adoption of various modes for arriving at substantially the same thing—the support and maintenance of the divorced wife.  In some of the States a reasonable proportion of the husband's property is given to the wife, and the matter ends.  In others, an annuity is fixed, which is not afterwards subject to be changed.  In this State, however, as in some others, our legislature, in analogy to the alimony of the spiritual Courts, have thought proper to allow alterations, to be made in the sound discretion of the Court, in whatever provision might have been before made touching the alimony allowed the wife, upon the application of either party.  At least, such seems very plainly expressed in the section of the statute in question; and it would seem to be going a great way to hold this section as applicable to divorces from bed and board only, unless all the other sections relating to alimony, were so held also; and we have seen the difficulties of so holding as to them.

It would seem to be better for the legislature to interpose, if inconveniences are too great, or abuses or other evils are likely to arise from this state of the law.

It appears from the case of Miller vs. Miller, 6th Johnson's Ch. Cases, p. 91, where a divorce a vinculo matrimonii was decreed for adultery on the part of the husband, that Chancellor Kent

22

inclined to the opinion, on the statute of New York, which, so far as cited by him, does not appear so broad and distinct as ours, that it would be in the power and discretion of the Court to vary the annual allowance thereafter, if the future circumstances of the parties should dictate such a course. In that case, it appeared from the report of the master that the aggregate value of the real and personal estate of the defendant was $4,550; of which all except $800 was real estate, and that the joint annual product of both was $325. Upon this state of facts the Chancellor proceeded to remark: "It appears to me that in this case, an allowance of one hundred dollars a year would not be unreasonable, and not more than sufficient to render the aged plaintiff comfortable: and perhaps it may be in the power and in the discretion of the Court to vary the allowance hereafter, if future circumstances in relation to the parties, or either of them, should dictate such a course; for the statute speaks of such maintenance or allowance as to the Court shall "from time to time seem just and reasonable." He accordingly decreed that sum "to be paid to the plaintiff during her natural life, or until further order of the Court;" and provided in the decretal order " that either party be at liberty to apply, upon a future change of circumstances in the parties, or either of them, for such variation or modification of this order, touching the said allowance, as their future circumstances may dictate to be just.".

With this understanding as to the law, we proceed to an examination of the merits of the case presented; premising, however, that in the exercise of jurisdiction of matters of this sort, the chancery Courts ought to employ the same rules of law which the Ecclesiastical Courts do, except in so far as they be found unsuited to our Courts, or in conflict with specific, constitutional or statutory provisions, or the general spirit of our laws. *Bishop on Divorce and Marriage, sec.* 21, *p.* 18.

I. In so far as this bill seeks any alteration in the original decree, upon the ground that any of the allowances therein made were meagre and inadequate; it is clear enough that no foundation is thereby laid for any relief. Because, if there was

any ground for that complaint, the complainant ought to have appealed. Such decrees are doubtless within our statute regulating appeals. And having failed to seek that remedy there can be no rational pretence, in the allegations of this bill, that any foundation is laid for relief on that ground by any proceeding in the nature of a bill of review.

II. It is equally clear that no foundation is laid for any such alteration, upon the improved faculties of the defendant, for no such improvement since the decree is alleged. On this point, DOCTOR LUSHINGTON, in giving judgment in a case before him in the Ecclesiastical Court, observed: " Where there is a material alteration of circumstances, a change in the rate of alimony may be made. If the faculties are improved, the wife's allowance ought to be increased; and if the husband is *lapsus facultibus*, the wife's allowance ought to be reduced. Applications of this sort are of rare occurrence. I only remember two instances where applications of either kind have been successful; the case of *Fowlkes vs. Fowlkes*; for an increase, and *Cox vs. Cox*, for a reduction. Applications to change the amount of alimony once fairly settled, ought, evidently, to be carefully scrutinized."

III. With regard to the attorney's fees,—*that* is alleged in the bill as showing the inadequacy of the allowances made by the decree, and upon *that* ground to impeach it; and, therefore, in that aspect, has been already responded to. It is to be further remarked, however, as to that matter, that in the usual course, it is considered in fixing the amount of alimony *pendente lite*, and embraced therein; or else is, in terms, allowed in addition thereto, as money to defray the expenses of the suit or defence. The bill before us is silent as to whether or not, in the original suit, this was done in either mode, otherwise than by dubious inference. What amount of alimony *pendente lite* was allowed is not stated. It does appear, however, that at the time of the final decree there was " *a balance* of $43 75," which was decreed to be paid, and as the Court below must be presumed to have done its duty in this particular, the law must presume— and especially so in the absence of any direct allegation to the

contrary—that the attorney's fees were considered in fixing the amount of alimony *pendente lite*. For aught that appears in the bill to the contrary, the Court might have done this, and the complainant received the money, and did not pay her lawyer.

In the case of *Fischli vs. Fischli*, 1 *Blackf. Rep.* 360, the Court in Indiana considered that the Court in Kentucky had already passed upon the subject matter upon which the bill before them sought adjudication, under circumstances more favorable to the complainant than in the case before us. The case was, that a wife had obtained a decree for divorce with an allowance for alimony of a certain sum of money, and the use for life of one-third of her husband's real estate within that State. And upon allegations that the avails of that decree, after paying the expenses of litigation, were insufficient for her comfortable support, she sought from the Courts of Indiana a further decree for one-third part for life of her husband's lands in that State. That Court refused all relief; putting their judgment upon the ground that it was to be considered that these *Indiana lands* had been taken into the account by the Kentucky Court, when estimating the amount of alimony; although they conceded that the Kentucky Court could not have controlled the lands of the defendant situate in Indiana; and although it appeared that a majority of the Court of appeals in Kentucky had decided that the division of the real estate was to be confined to the State of Kentucky, from which one of the Kentucky Judges dissented, being of opinion that the real estate in Indiana should be taken into the estimate also. The Indiana Court saying: "A sufficient part of the husband's property lay in Kentucky to constitute an adequate provision for the wife, and the Court, with a view to all the property, might have given a proper proportion to the wife and *allotted her that portion in Kentucky;*" and applying the principle that when a matter has been finally determined by a competent tribunal, it ought to be considered at rest, say that, "that principle not only embraced what actually was determined, but also extends to every matter which

the parties *might have litigated in the case.* 5 *Bac.* 439, *and authorities there cited."* ·

IV. With regard to the allegations in reference to the allow-ance made to the complainant for the support of the child, there is no foundation laid for any relief. The bill does not state his age, and this had not increased a full year from the decree until the filing of this bill. If the allowance for his support was inadequate, the complainant need not have undertaken it at all. The father was liable at law for necessaries for him. It does not appear but that the father would have taken him and reared him up, if the mother had consented. Nor does it appear in any way that the father was unwilling or unfit for that duty. The decree, so far as it is shown, does not give the custody of the child to his mother exclusively, but simply allows her $150 per annum for his support during the period he may remain in her charge. If these terms, which really seem reasonable enough, are onerous, the complainant need not embarass herself by keeping him at all.

V. Nothing remains in the bill having any approach to equity, except that, at the end of not quite one year from the rendition of the decree, the sum of $163 33, besides interest, remains unpaid to the complainant, of the aggregate of all the allowances made to her, for which under the decree she has a lien upon the property of the defendant, as well as for such sum as may in the future fall due to her.

There was no necessity for a bill for the redress of this grievance; a summary application to the Court was sufficient under the ample provisions of the statute for enforcing such decrees.

Finding no error in the record the decree rendered in the Court below will be affirmed.