Mary H. Lillie, Appellant, v. Amos Shriver et al., Appellees.

CONTRACTS: Inexcusable Neglect to Read. A party will not be heard to say that he signed an instrument *because of false representations as to its contents*, when he could read, did not read, and was not prevented from reading, by any trick, artifice, or fraud; and especially is this true when the one signing knows, at the time, that the person making the representations is interested adversely to the signer.

ACKNOWLEDGMENT: Evidentiary Force in re Issue of Misrepresentation. Principle recognized that, on the issue whether an instrument was read to the party executing it, the recital of the acknowledgment may be given consideration.

CONTRACTS: Fraud in re Signing. Evidence reviewed, and held quite insufficient to show that the signer of an instrument was prevented from reading the same.

CONTRACTS: Consideration. An agreement under which a claimant to the absolute ownership of realty is given the right to the *possession* of the property for a stated period, is a sufficient consideration for an absolute waiver of said claim of ownership.

HOMESTEAD: Inapplicability of Alienation Statute. A spouse who is asserting a contested claim to the absolute ownership of realty may compromise and waive such claim *without the consent of the other spouse,* even though, had the claim been established, a portion of the property would have constituted a homestead. (Sec. 2974, Code, 1897.)

*Appeal from Iowa District Court.*—R. P. Howell, Judge.

November 1, 1920.

Rehearing Denied January 20, 1921.

The suit of the plaintiff, brought to quiet title, was based on an alleged gift of lands made to her by her grandfather, Michael Shriver. In addition to joining issue generally, the appellees affirmatively defended with accord and satisfaction.

The petition of the plaintiff was dismissed, and she appeals.— *Affirmed.*

*Stapleton & Stapleton,* for appellant.

*Havner, Roller & Hatter* and *Sullivan & Kirby,* for appellees.

SALINGER, J.—I. Before appellant brought the present suit, she instituted a similar one. In both suits, she seeks to quiet title to described lands, claiming that same became her property by gift of her grandfather, Michael Shriver. In both she claims that, from March, 1896, on, she and her husband had lived on the land, claimed to be absolute owners in fee simple; that plaintiff has maintained hostile, adverse, and uninterrupted possession as against the world; and that the defendants, the children of Michael Shriver, are making adverse claims, and denying that said gift was made.

1. CONTRACTS: inexcusable neglect to read.

Plaintiff dismissed the first suit in writing, and in words as follows:

"Comes now Mary Lillie, plaintiff in the above-entitled cause of action, and asks the court to dismiss said cause of action at plaintiff's costs. That the said Mary Lillie, plaintiff herein, further states that she makes no further claim of any kind on the real estate or personal property belonging to the estate of Michael Shriver, deceased, and she fully releases the estate from any claim that she may have against the said estate or the administrators thereof, of every kind and character.

"Mary Lillie."

The defendants urge this writing in bar of the instant suit. They plead the same as being an accord and satisfaction; that said writing of dismissal was on the consideration that plaintiff should be permitted to remain on the land until March 1st next ensuing; that she was to dismiss and surrender all rights she claimed in and to said land, if that permission were given; and that it was given. Further, that plaintiff agreed to pay rent and to become the tenant of defendants until said time; and that, by this agreement to become tenant and to pay rent, plain-

tiff is now estopped to avoid the said dismissal and settlement.

The plaintiff pleads in avoidance that, while the first suit was pending, the defendant William Shriver, her uncle, represented to her that her grandmother was greatly worried about the suit, and that plaintiff was driving the grandmother to her grave; that, unless the suit were dismissed, it would kill the grandmother; that, if plaintiff would dismiss, the matter could be settled without suit, and that defendants wanted everything done and settled as plaintiff's grandfather, Michael Shriver, wanted it done; that plaintiff fully relied on these ''representations.'' Finally, it is pleaded that, believing the heirs of her grandfather would assent to the gift made to her by the grandfather, and fully believing she was but signing a paper that would dismiss her cause without prejudice, she signed without reading, on the representation of one Sullivan, an attorney for the defendants, that the paper signed was not more than a mere dismissal without prejudice.

The plaintiff as a witness testified, in substance, that these representations were made. And Mary, daughter of the plaintiff, eleven years old at the time of the trial, says she heard her uncle William Shriver say he wanted plaintiff to dismiss the case; that it would send grandmother to the grave in disgrace; and that he wanted it settled just as grandpa wanted them to settle. Appellant urges that here is a case of false representations, mixed with a promise which it was at the time not intended to keep; and that, therefore, a fraud was committed, against which a court of equity will relieve.

Grant that this is a correct abstract statement. But the question remains whether the plaintiff, in signing without reading, was not guilty of such negligence as that she may not now assert that she is not bound by all the provisions of the paper signed by her. It is elementary law that, though there be a fraud committed in obtaining a signature, the perpetrator of the fraud may still urge that nothing prevented the party from reading before signing, and that, therefore, he may have no relief, even though there were false representations as to the contents of the paper. *Bonnot Co. v. Newman Bros.*, 108 Iowa 158; *Bannister v. McIntire*, 112 Iowa 600, at 604; *Gulliher v. Chicago, R. I. & P. R. Co.*, 59 Iowa 416, at 422; *Hopkins v.*

*Hawkeye Ins. Co.*, 57 Iowa 203; *McCormack v. Molburg*, 43 Iowa 561; *Reid, Murdock & Co. v. Bradley*, 105 Iowa 220, 221; *Wallace v. Chicago, St. P., M. & O. R. Co.*, 67 Iowa 547; *Jenkins v. Clyde Coal Co.*, 82 Iowa 618, at 621; *McKinney v. Herrick*, 66 Iowa 414. As said in *Crim v. Crim*, 162 Mo. 544 (63 S. W. 489), to permit defending against what was signed that the signer did not read what he signed, and, therefore, did not know the contents of what he signed, "would absolutely destroy the value of all contracts." To avoid the signing, something must have prevented reading. This is manifest. There can be no occasion to avoid a charged fraud, without assuming there was a fraud to be avoided. If something which is a defense though a fraud has been committed cannot avail because a fraud has been committed, the value of the right so to avoid would be wholly academic. See *Spitler v. Perry Town Lot & Imp. Co.*, 189 Iowa 709. In fewer words, according to the cases we have cited, it is hornbook law that if, through a false representation of the contents of a paper, one sign that paper without reading it, and nothing in the way of trick, artifice, or fraud working a prevention of the reading has been practiced, then, though it be assumed that the contents were falsely represented, the party who signs without reading, when he might have read, "must accept the consequences of his own folly." In still fewer words, if one who is able to read, and was not prevented from reading, signs without reading, the false representation that induced the signing was not the proximate cause of injury, because, if the paper *had* been read, the false representation would have been ineffectual.

II. We have so far assumed the truth of what plaintiff charges. But the fact is, these charges were not established by a preponderance.

Plaintiff says that she knew, or heard it stated, that Sullivan was called to prepare dismissal papers; that defendant William Shriver told Vette for what purpose plaintiff had come, and that he wanted her to dismiss. Vette testifies that plaintiff asked him if he thought the heirs would be willing to let her stay on the place if she would sign the paper, and that he told her he was satisfied such an arrangement could be made. He testifies that plaintiff told him that she wanted to dismiss; he

thinks she said she was awfully glad she had done so, and that it had been worrying her a great deal; that, when Sullivan came, he began talking to plaintiff, and she told him she wanted to dismiss; that she said, ''Well, I have decided to dismiss this action that was started, and I want to know what you advise me to do in the case;'' and that he told her that he was in no position to advise her; that he didn't want her to go and tell her attorneys he was giving that kind of advice; and that, if she dismissed, she would have to do so on her own account.

Sullivan testifies that, when he asked plaintiff whether she was satisfied to not go any further with the suit, and to make no further claim on the Shriver estate, she answered, ''Yes, if I go on with this suit, all the Shrivers will be mad at me, my mother will disown me, and I want to get out of it;'' that she stated further, ''I don't know whether I can get anything out of this suit, and I might get something from my mother.'' Vette testifies that plaintiff thought that, on account of her mother's feeling the way she did, it was the best thing for her (plaintiff) to do; that her mother was not satisfied, the way she was doing. The sole response of the plaintiff is the statement that she does not know whether her mother was very displeased about her having brought this suit or not.

Nor is it shown by a preponderance that the paper was not read over. Sullivan testifies that he did read it over to plaintiff, and that she said it was all right; Vette, that Sullivan read it over, and then took her acknowledgment, and that, before doing so, Sullivan read the paper over to her, explained to her that she was releasing her interest in and claim to the Shriver estate thereby, and she told him she understood she was releasing all claims against the estate; and then there is the presumption arising from the notarial acknowledgment certificate, which recites that the signer acknowledged the execution of the instrument to be her voluntary act and deed. And it is significant that all said by plaintiff against this is this:

2. ACKNOWLEDG-MENT: evidentiary force *in re* issue of misrepresentation.

''Q. Did Sullivan read this paper to you? A. I don't remember. The baby cried; was fussing around so I don't remember whether he did or not.''

III. If it were found to be according to the weight of· the evidence (and it is not), that Vette, in the interest of defendants, told the plaintiff that the paper before her was just a dismissal of the cause, and if the same statement were proved to have been made by Sullivan, an attorney for the other party (and it is not proved), all this will not avail; because one who is able to read and is not prevented from reading cannot avoid the consequences of signing without reading, by showing that she signed because of a false representation concerning the contents of the paper, made by one whom she knew to be adversary in interest. *Green v. Wilkie,* 98 Iowa 74, at 80; *Wallace v. Chicago, St. P., M. & O. R. Co.,* 67 Iowa 547, at 550; *Och v. Missouri, K. & T. R. Co.,* 130 Mo. 27 (31 S. W. 962, 967); *Bannister v. McIntire,* 112 Iowa 600, 601; *McCormack v. Molburg,* 43 Iowa 561, at 562; *Shores-Mueller Co.· v. Lonning,* 159 Iowa 95, 100.

IV. As to prevention: The plaintiff testifies that, when she met the defendant William Shriver, her brother, he desired her to dismiss, for reasons already stated. She told him she would come and see her lawyers, and she

3. CONTRACTS: fraud *in re* signing.

started to town to see them. Up to this point, then, no one certainly prevented consultation with the lawyer. But plaintiff continues that, when she started upstairs (presumably to the office of her lawyers), defendant inquired where she was going; that she told him she was going to see her lawyers; and that he thereupon took hold of her by the coat sleeve, and said, "You come on to the bank with me;" and that she went. The little girl, Mary, who was present, merely says that, when the mother started to go upstairs, her uncle said, "Come on with me to the bank;" and that they went. If this were undisputed, it certainly does not establish that plaintiff was compelled to abandon her project of seeing her lawyers. She had a perfect right not to go to the bank, and it is not pretended that physical force compelled her to go. Be that all as it may, the fact that she was prevented from having this consultation certainly did not prevent her from reading the paper which she found after she left for the bank. Moreover, Sullivan testifies that he inquired whether she didn't have this firm of lawyers (the one to which she claims she was going)

hired, and that plaintiff said she had; that he then asked her why she didn't go to them, and get them to dismiss the suit for her; and that she replied she didn't want to go up there.

At any rate, the stubborn fact remains that, with every ability to read what she was asked to sign, and, to put it at the strongest for her, she signed without reading, in reliance on the representation of opposing counsel that the paper was something other than it proved to be. The only other attempt to show any diversion or prevention can scarcely be said to be anything practiced by the defendants. It is this: The little girl Mary was present, and had charge of a baby. This baby was crying quite a bit. Mary stayed in the room with her mother, and took care of the baby. We are constrained to hold that, on the plaintiff's own theory, her own neglect estops her to say now that the paper she executed contains something other than it was represented to her it did contain.

V. It appears without dispute that, while the right to stay on the farm was promised by Vette, who had power of attorney to lease, that, assuming that this was not a sufficient considera-

4. CONTRACTS: consideration.

tion, the defendants were afterwards consulted, and agreed to what Vette had promised; and that she was permitted to remain. Hence, there is consideration to support the settlement.

VI. Citations and argument indicate appellant is of opinion that the doctrine ruling in the alienation of a homestead should have application here. And reference is made to Section

5. HOMESTEAD: inapplicability of alienation statute.

2974 of the Code, which provides that no conveyance of the homestead is effective unless both husband and wife join in the execution of the same instrument. And our attention is called to cases such as *Donner v. Redenbaugh,* 61 Iowa 269, and *Stinson v. Richardson,* 44 Iowa 373, to the effect that a verbal assent to a conveyance on part of the wife will not make it binding. There is an allegation that 40 acres of this land have been the homestead.

We are unable to see how this doctrine has any application here. The defendants denied that plaintiff had any title whatever. If that prove to be the fact, she, of course, had no homestead right. When the parties made settlement, that was an

adjustment of the asserted homestead right, as well as of other claims made by the plaintiff and denied by the defendants. Though a homestead conceded to exist may not be alienated except as the statute provides, it does not follow that, if the claimant of the title compromise a suit in which title, and therefore homestead right, are challenged, the settlement is invalid unless the husband signs the dismissal of the plaintiff's suit. We are of opinion that the claimant of title in fee simple may compromise and settle a suit in which that right is challenged, and that such settlement may not be avoided because the husband took no part therein. This must be so, because, if the suit had gone to termination, it would not be claimed that the homestead right remained, on decision that there was no homestead right. The statute governs the alienation of the homestead owned by the grantor, and does not apply to releasing a mere assertion that the homestead right exists, which assertion the other party to the settlement disputes.

The foregoing sufficiently indicates why we are constrained to hold that the decree appealed from must be—*Affirmed.*

WEAVER, C. J., EVANS and PRESTON, JJ., concur.