ENCHUL BARISH, Appellee, v. KITTIE BARISH, Appellant.

**EVIDENCE: Declarations—Transcript as Declaration Against Interest.**
1   A transcript of the testimony of a witness is admissible against said witness in any subsequent proceeding to which he is a party, when such testimony becomes material as a declaration against the interest of said witness.

**DIVORCE: Custody of Children—Improper Custodian.** Record reviewed, and held insufficient to justify a change of custody (1) on the ground of unfitness of the custodian, or (2) on the ground that the parent was prevented from freely visiting the child.

**DIVORCE: Attorney Fees on Subsequent Proceedings.** A divorced wife may not have attorney fees taxed in her favor and against her former husband, in a proceeding instituted by her for a modification of the original decree.

*Appeal from Woodbury District Court.*—George Jepson, Judge.

December 31, 1920.

The parties were at one time husband and wife. A petition of the husband, seeking divorce, was dismissed. The cross-petition of the wife was sustained, and she was granted a divorce on the ground of cruel and inhuman treatment. The decree allowed her $1,500 alimony, gave her the care and custody of the child Sidney, with an allowance of $20 a month for his support and maintenance. It awarded the custody of the child Dresmond to the father. The defendant applied to the court to modify the decree by enlarging the allowance of alimony made to her, by increasing the allowance made for the support and maintenance of Sidney, and by transferring the custody of the child Dresmond from the father to her, and that an allowance be made for his support. The trial court declined to make any modifications, except that it increased the allowance for the maintenance and support of Sidney from $20 to $30 a month. The defendant appeals.—*Modified and affirmed.*

*Oliver, Harding, Oliver & Royal* and *Naglestad & Pizey,* for appellant.

*Sears, Snyder & Gleysteen,* for appellee.

Salinger, J.—I. The original decree provides $20 a month for the support of the child Sidney. On the application before us, the court increased this to $30 a month, and appellant urges that it should be increased to $75.

We incline to the opinion that $30 a month is insufficient. Since the original allowance of $20 a month was made, and even since it was increased to $30, there has been a universal advance in the cost of the necessities of life, and we think, too, there has been such change in the financial condition of the parties as to warrant a change in this allowance.

Appellee claims that there is no competent evidence that the financial condition of the father has changed for the better. The exact claim is that the only evidence which tends to show

a betterment is found in a transcript of the testimony taken on a hearing in habeas corpus, to obtain the custody of the child Dresmond. The argument is that, under the statute, such transcript may be used as evidence, but only on a retrial; and, of course, this proceeding is not a retrial of the habeas corpus action. While it is true the transcript in that first proceeding is not a general instrument of evidence, and therefore may not be used as such here, because this is not a retrial, it is equally true that, while the statute does enlarge the availability of the transcript by permitting its use on a retrial, that does not affect the receiving of admissions made by a party to the suit against interest. Though the transcript is not receivable to show what witnesses other than one of the parties testified to, it is admissible against these parties on anything in it which is in the nature of an admission. Without aid from any statute, any admission against interest must be received, if relevant, whether it be found on a transcript or upon a pine shingle.

1. EVIDENCE: declarations: transcript as declaration against interest.

We agree that, despite a presumption that one worth $30,000 at an earlier time is presumed to be still worth that much at a later time, there is no presumption that he has doubled the $30,000. At the time the original decree was entered, the showing was that the husband was practically insolvent. At the habeas corpus hearing, he admitted, in effect, that he was then worth $30,000. He is now in possession of a successful business, and, on the presumption of continuance, is still worth $30,000. We think the record justifies us in increasing this allowance to $50 a month. We do not overlook no witness has disputed the statement of the mother that $75 is necessary. But on such question as that, the testimony of no witness can be conclusive upon the courts.

We should be more hesitant to interfere with the judicial discretion lodged in the trial court as to such allowance, were it not so notorious how the cost of living has advanced; were it not true that there is no real contest at this point, because the father has expressed himself as being willing to be liberal in the maintenance of this child, and has voluntarily paid more than was decreed in the original decree, and has bought clothing for the boy; and were it not true that our own order is subject to

modification at any future time, upon exhibition of proper reason for modification.

II.    The major reason assigned for asking the change of the custody of Dresmond is the alleged proven swearing of his

2. DIVORCE: custody of children: improper custodian.

stepmother, with whom and his father he is living.

There is, as is quite usual in cases where the feeling that runs through suits of this kind prevails, a decided tendency to exaggerate. And that should be taken into consideration in weighing the testimony on this head. There is much of it that relates to responses made by the stepmother when plaintiff called her on the phone, and had others do so. And closely connected with this is the testimony that the stepmother refused to let Dresmond talk over the phone when his mother called. The plaintiff testifies that, when she asked on the phone whether she couldn't talk with Dresmond, the stepmother said, "No, you cannot;" that she then said she would like to know how the boy was getting along, and the stepmother answered, "It is none of your damn business." Plaintiff says she phoned during the Passover week, and asked if she couldn't please talk to Dresmond, and the stepmother said, "You know you can't. I am liable to let you talk with him;" and that plaintiff told her she wanted to know whether he went to school that day, and Mrs. Barish answered, "It is none of your damn business;" that she hollered as loud as she could. It is claimed plaintiff asked a Mrs. Chrischilles to phone the stepmother, inquiring how Dresmond was, and plaintiff says that the response was a swearing at the one who was calling, and she was told it was none of her damn business; also, that there was some more cursing; that the stepmother did a lot of swearing, and told the party to go to hell. She claims to have had a talk which a Miss Allen overheard on an extension phone, and in which plaintiff asked, "Will you be kind enough to let me talk with Dresmond," and the answer was, "No, you can't talk with him," and then, on inquiry why she couldn't talk with her child, the answer was, "It is none of your damn business." A Mrs. Steere testifies she heard the stepmother tell plaintiff plaintiff couldn't talk to Dresmond any more; that no one could talk with him any more, and when plaintiff asked, "Who do you

think I am?" the stepmother answered, "It doesn't make a damn bit of difference who you are." It is testified that plaintiff has tried to get into communication with the boy by phone, since; that the stepmother answered, most of the time; that, when asked if she couldn't talk with Dresmond, the stepmother would say: "I told you you couldn't talk with him. Don't call up and try to talk with him." Plaintiff says she responded that she was the boy's mother, and asked whether she couldn't talk with him, and the stepmother said: "No, you can't. If you were a decent mother, you might have both of your children; but we will have them both yet." She testifies further that, on one of these phone broils, the stepmother said, "You better go and 'see your fellow you have been around with;" that, on inquiry, Mrs. Barish named a boy of 17, who lives next door to plaintiff, with his father; that the boy Dresmond told plaintiff about it, next day, saying he had heard his stepmother say plaintiff had a fellow, and had better go and see him. One of these talks was overheard by Mrs. Weinberg, and is claimed to have been this: Plaintiff asked, "Can I please talk to Dresmond, it is my child and I would like to talk to him," and the stepmother answered, "I am liable to let you talk to him;" that thereupon the mother said that the stepmother had not borne any aches or pains for the child, and the stepmother answered: "I got the man you tried to get back, and you are so jealous you can't see straight; that is what is the matter with you." Plaintiff testifies she answered that Mrs. Barish had been picking a long time, and that at last she had picked something, and that thereupon Mrs. Barish answered, "We will fix you next Monday; we will make you put a black veil over your face." Once, when the stepmother had said she couldn't talk with the boy, plaintiff asked her whether she would let the little brother Sidney talk to him, and that just because the stepmother was married to their father was no reason why plaintiff couldn't talk to her children, and the stepmother said: "You are so God damn jealous is all that is the matter with you; you are so jealous you can't see straight." Plaintiff continues that once she had Sidney call up and ask if he could talk to Dresmond, and she heard what was answered, because she had the receiver

to her ear, and the answer was: "You dirty little snot; you
know you can't. We will fix you and your 'damn mother."
Plaintiff had a boy call up and ask to talk to Dresmond, saying
he was a little boy who knew him, and the stepmother answered:
"You are a dirty little liar. I know who you are talking for,
and you are going to hell with her together." This talk the
plaintiff claims she overheard on the phone.

True it is, the boy says that he didn't get to talk with his
mother because his stepmother wouldn't let him, and that he
had heard her tell his mother, about ten or twelve times, that
he couldn't talk to her. But it plainly shows in the record that
this was in large part prompted by the fact that the mother
called on the phone with very annoying frequency. Plaintiff
says she never refused to allow the father to see or visit with
Sidney, though he has refused to allow her to visit with Dres-
mond; and that, when she asked him on the phone whether she
could get to see Dresmond, and that she had called him at school,
he answered, "No, you can't talk with him; you can't get to
see him, that's all." On the other hand, the boy Dresmond
testified:

"Q. Did you want to talk with your mother? A. Some-
times I do, and sometimes I don't. She calls me up on the same
days after she sees me at school."

The boy was asked, "Did you hear your stepmother swear
sometimes?" and said:

"Once she was at the phone, and my mother bothered,
always calling up people, and talked to her just to make her mad;
and once she got disgusted, and she swore; and that is the only
time I ever heard her swear. The rest of the time, I was in
school, and I didn't know about it."

There is evidence from which it may fairly be said that
appellant customarily called every day, and twice on Saturdays
and Sundays; that she phoned the stepmother repeatedly, and
had others do so, ostensibly to inquire about the child, but in
fact for the purpose of more or less annoying the stepmother.
There is testimony from the little boy that once she called up
about ten times, and that at last his stepmother got disgusted,
and that, from that time on, he never talked to her. When he
was free from influence, and examined separately, he testified

that sometimes his mother called his stepmother names in Jewish which he thinks mean "devil;" that sometimes she gave him peanuts, and told him to throw them around the house, so that the stepmother should pick them up; and that she told him not to like his stepmother. On the contrary, he testified that the stepmother never told him not to like his own mother. There is no evidence assailing the fitness of the father. There is nothing in the testimony of the child to indicate anything other than that he is gentlemanly, and that his surroundings have left him uncorrupted. On his separate examination, he testified he wanted to remain with his father: that his present home life was pleasant; that he was well cared for and happy, and did not want to be taken away. As said, there is evidence which does not seem to be disputed that the plaintiff attempted to teach her child so to treat his stepmother, with whom he was living, as that the teaching casts about as much reflection on the plaintiff as the swearing does upon the stepmother.

What may have been improper conduct on part of the stepmother should be dealt with in the light of all the evidence.

There is complaint that the mother is not permitted to visit Dresmond freely, as it is claimed the custodial order made in the original proceeding permitted her to do. That, standing alone, will not warrant a change in custody, at least until complaint is made to the court that made the custodial order, and other means of correction, short of changing the custody, sought on such application. And something is to be said on the facts. The boy testifies that he has been able to meet his mother in school; that he has not been to her rooms lately, because his father wouldn't let him come over, but he adds that his father told Sidney that Dresmond could come over, if Sidney would come over to see Dresmond; that he went over, but Sidney never came, and that this was the only time he ever went there; and that, when he asked his mother why Sidney couldn't come, she answered that she wanted him to do so, but that the little boy wouldn't do it. It can fairly be found, too, that the right of visitation was abused, and that this annoyance mitigates, while it may not excuse, what the stepmother said. And part of the feeling was engendered because of the fact that when, at one time while the father was away on his wedding trip, he left the

boy with the mother, on his return he had to institute habeas corpus proceedings to have the boy returned to him.

No one can wholly defend the attitude and conduct of the stepmother. She, in common with humanity as a whole, is not faultless. It may be conceded that she has, at times, sworn, when talking to the plaintiff on the telephone. But it cannot be said that this was wholly gratuitous, and that the plaintiff did nothing to provoke what happened, reprehensible as it may have been thus to have met the annoyance.

The situation is quite well summed up by the statement of the trial court:

"I think the stepmother has indulged in some language that is probably not very ladylike, but I take it she has repented, and that probably she has been provoked to it by the repeated calling up on the phone by plaintiff."

Confessedly, the welfare of this child is the controlling factor. He is at an age where a boy is ordinarily better governed by a father. He is an inmate of a well-kept-up home, and has the advantages that the wealth of his father gives in the way of comfort and upkeep and schooling. His mother cannot do this much for him. Whatever may be said against the stepmother, there is no charge that the father offended in any way, and that he was not acting properly toward the child.

To a substantial extent at least, such change of custody is addressed to the sound discretion of the court, and is not as freely interfered with as a law pronouncement is. On the whole, we do not find that this discretion was abused, and we affirm the order refusing to make the change in custody prayed. The facts in the cases relied on by appellant differentiate these cases from the case at bar.

We are asked to tax an attorney fee in favor of the attorneys for the appellant. She is no longer the wife of the appellee.

3. DIVORCE: attorney fees on subsequent proceedings. Section 3177 of the Code of 1897 provides that:

"The court may order either party to pay the clerk a sum of money for the separate support and maintenance of the adverse party and the children, and to enable such party to prosecute or defend the action."

We hold that neither this nor any other statute gives this

appellant any better claim to the taxation of an attorney fee than is given any litigant who seeks to make a money recovery without having a contract for the taxing of attorney fees.

The majority of this court also affirm the order of the trial court refusing to increase plaintiff's alimony. Whatever the extent of the power of the court may be to make such increase, it is always slow to exercise such power, except in the presence of extraordinary circumstances, such as are not present here. *Ostheimer v. Ostheimer,* 125 Iowa 523. On this ground, the order of the trial court is sustained by the majority.

Except as indicated in Division I hereof, the decree entered below is, accordingly, affirmed.—*Modified and affirmed.*

WEAVER, C. J., concurs in result.

LADD, EVANS, PRESTON, STEVENS, and ARTHUR, JJ., concur.

SALINGER, J. (concurring specially). I think the time has come for deciding the question; and if it should not be done here, I cannot imagine a case wherein the question would have to be decided. Does our statute give power to modify an allowance of "gross" or "permanent" alimony? Before considering that question, eliminations should be made.

We are not concerned with the numerous decisions holding there can be no alteration or modification unless the power to alter or modify is reserved in the original decree, and that there may be alterations or modification if such reservation be made. For the decree at bar makes no reservations. We obtain no help from the long list of cases where a modification of permanent alimony was respectively denied or granted, and the action was taken upon statutes that plainly gave the power, or as plainly denied it. And we enter upon considering the major question in the case upon a well-made concession that the application to have the permanent alimony in this case enlarged must be denied, unless we can say that our statute authorized a change up or down as to "permanent alimony" allowed. See *McFarlane v. McFarlane,* 43 Ore. 477 (73 Pac. 203); *Rigney v. Rigney,* 62 N. J. Eq. 8 (49 Atl. 460); *Henderson v. Henderson,* 64 Me. 419, 421; *Cariens v. Cariens,* 50 W. Va. 113 (40 S. E. 335); *Sammis v. Medbury,* 14 R. I. 214, 216; *Stratton v. Stratton,* 73

Me. 481, 483; *Mayer v. Mayer*, 154 Mich. 386 (117 N. W. 890);
*Bassett v. Bassett*, 99 Wis. 344 (74 N. W. 780, at 781).

It is conceded we have never settled whether our statute
authorizes a change as to permanent alimony. In *Spain v.
Spain*, 177 Iowa 249, at 258, we declare this point has never
been decided, and expressly decline to decide it. Full investi-
gation has satisfied us that, while it might have been decided
repeatedly, it was not done.

II. Dealing with it, then, as matter of first impression in
this court, we have to decide whether our statute gives any
power to change a decree allowance of "permanent alimony,"
merely because a change in circumstances would be met by such
modification. The statute does not contain the word "alimony."
It gives power, when a divorce is decreed, to make "such order
in relation to the children, property, parties, and the main-
tenance of the parties as shall be right." And "subsequent
changes may be made by it in these respects, when circumstances
render them expedient." Code Section 3180. In these words
must be found authority to do what appellant asks. If not
found there, such power does not exist.

We start in with the conceded fact that "maintenance of
the parties" is very often arranged by an order for stated pay-
ments to be made periodically in future, and that, as to such
provision, the right is reserved to make such modification as
future change may necessitate. Therefore, it does not neces-
sarily follow that giving power to make subsequent changes "in
these respects," i. e., "maintenance of the parties," authorizes
change in gross or permanent alimony. The grant may, so far
as expression in terms goes, be authority for no more than to
change orders that periodical payments for support be made.
The terms do not compel a construction that there is power as
well to modify a decree allowance of permanent alimony. Should
that be the interpretation, though the statute does not in terms
compel it? Assume that such should be the construction if
"support and maintenance" of the one spouse is the equivalent
of "alimony" or of "gross alimony" or of "permanent ali-
mony," and we have the question whether these and the statute
phrase are equivalents. My research establishes that allowance
for the future support of the divorced wife is not, in fact, ali-

mony, in the sense of the ecclesiastical law of England, but is more strictly an arrangement in lieu, owing to the size of the estate of the parties, so as to return to the wife her just portion of that property which belonged to both during the marriage, and which the labor and care of both may have equally contributed to procure and preserve. *Smith v. Smith,* 45 Ala. 264. Permanent alimony is regarded as the equivalent of a partition, as an allotment of a portion of the husband's estate to which the wife is equitably entitled. *Audubon v. Shufeldt,* 181 U. S. 575 (21 Sup. Ct. Rep. 735). In *State v. Cook,* 66 Ohio St. 566 (64 N. E. 567), the court said that such allowance "is in the nature of a partition. Recognizing the right of the wife to participate in the accumulations which are presumably the result of their joint efforts and joint economies;" that the allotment decree treats the allowance as part of the estate standing in the name of the husband, and in which the wife has a right to share; and the court seizes her share, appropriates it to her, and makes her legally entitled thereto. In *Miller v. Clark,* 23 Ind. 370, the gross allowance is said to be a decree making a just and equitable settlement between the parties as to their marital relations, in view of all the circumstances of that relation, and of the property of the parties and their joint labors and accumulations during the marriage; and that the sum so given to the wife thereupon becomes her absolute property, as upon an equitable partition between them. That is the effect of *Mahoney v. Mahoney,* 59 Minn. 347 (61 N. W. 334); and of *Beard v. Beard,* 57 Neb. 754 (78 N. W. 255, at 256); and of *Bauman v. Bauman,* 18 Ark. 320; and of *Andrew v. Andrew,* 62 Vt. 495 (20 Atl. 817); and *Lyon v. Lyon,* 21 Conn. 184, 185. In *Daniels v. Morris,* 54 Iowa 369, we held that "alimony was subject to the control of the court in adjusting the property rights of the parties;" and that, in suit for divorce and alimony, the court may adjust the rights of the parties by "making such a division or disposition of the homestead between the parties as may appear to be just and equitable."

Adjustments in the nature of division or allotment, or in the nature of money equivalent for division or allotment or partition, ordered when decree of divorce is entered, are not "orders in relation to the maintenance of the parties;" and author-

ity to make changes in orders relating to maintenance is not authority to change an allotment, a partition, a sequestration, or a money allowance made in the stead of these. An order that payments shall be made to maintain the former wife is a draft upon the resources of the former husband, whereby, despite the divorce, there is to be continued such duty to support the wife from day to day as existed while the marriage subsisted. It is an income granted. The lump allowance is a sequestration, which is to be capital from which the divorced wife is to make income which, in whole or in part, is to be a substitute for what the former husband was bound to furnish, prior to the divorce.

### 2-a

On reason, an order for maintenance and an allowance of permanent alimony should not be treated alike as to permanency. The decree of divorce places the parties as if they had never been married. It terminates both privilege and duty, and the woman has no more claim upon the former husband than upon any other member of the community. *Plaster v. Plaster,* 47 Ill. 290, at 294. The duty is so utterly abrogated that her subsequent adultery will not warrant a return of any part of the permanent alimony. *Cariens v. Cariens,* 50 W. Va. 113 (40 S. E. 335). As utterly abrogated is privilege. Neither retains any right in after-acquired property of the other. *Mitchell v. Mitchell,* 20 Kan. 665, at 667; *Storey v. Storey,* 125 Ill. 608 (18 N. E. 329). And it is plain that, if the permanent allotment may be changed, it could well happen that an interest in after-acquired property will result. It is on reasoning such as this it has been said that the judgment for permanent alimony is as absolute and permanent as is the decree of divorce. *Mitchell v. Mitchell,* 20 Kan. 665, at 667. It is declared by *Smith v. Smith,* 45 Ala. 264, that an award of permanent alimony is a provision then and there finally made, to meet the changed status; is a final provision made while the bonds still subsist, furnishing capital wherewith the former wife may commence life anew, after her expulsion from the household of her husband and the withdrawal of his liability for her maintenance and support; and it is the consensus of opinion that this object can best be accomplished by making such an allowance absolute

and permanent. This reasoning establishes as a premise that
the award of gross alimony contemplates the future, and deals
with it. Unlike a provision for periodical payments, ordered
made to furnish the former wife support, the court, in making
the commutation, takes into consideration what changes in
health, earning capacity, or property the future may bring. If
it err, by making an allowance that proves too large, or too small
an allowance, on the happening of possible contingencies, it is
an error such as may be committed in any judgment adjusting
human affairs, and the remedy is by direct attack, such as by
appeal. It can no more be set aside or modified merely because
the future has been misapprehended than can any other judg-
ment. But in making provision for future periodical payments,
the case stands different. The court does not and need not con-
sider changes that the future may bring, because the provision
made contemplates payments to be made in the future, and
because the judge knows that, if the allowance made be too large
or too small, there is power to mold it to changed conditions.
It is said in *Plaster v. Plaster*, 47 Ill. 290, that, had it been a
yearly sum, then the alteration of the circumstances of the
parties might, in many cases, be such as would require its re-
duction or increase in amount. But where a gross sum is re-
ceived for or in lieu of alimony, it must be held to be in full
discharge and satisfaction for all claim for future support of
the wife. In a word, in the one case future contingencies are
considered; and, if the future shows they were not properly
weighed, it is an erroneous judgment, which becomes final if
not appealed from. On the other hand, a provision for future
maintenance payments is but an adjustment made to meet con-
ditions as they exist at the time, and the court does not closely
scan the future, because review in future is not foreclosed. See
*Narregang v. Narregang*, 31 S. D. 459 (139 N. W. 341); and
*Read v. Read*, 28 Utah 297 (78 Pac. 675).

### 2-b

And it is not amiss to devote a word to public policy. If,
on allotment of a gross or permanent so-called alimony, the right
remains to enlarge it on proof of changed conditions, it will be
the enlargement of capital, instead of income. And, if permitted

at all, there is little tangible limitation upon how large the increase may be. Even if the divorce were granted for the gross fault of the wife, the divorced husband would at no time know how much of a potential lien exists upon property that he owns or may own in future. If the right to such modification remains, all buyers from him must take subject to the possibility that the modification will be made; and, as said, being an increase of capital, great increase in the wealth of the husband and the needs of the wife might work a very great enlargement, and so there would be an inchoate cloud upon every title standing in the name of the former husband. True, on the same reasoning, there is peril from an increase of support money. But, in the nature of things, the possible increase of that is negligible, compared to what an increase of the fund from which income is derived might be, and, unlike permanent alimony, the statute declares in plain words that orders for mere maintenance may be changed.

Indeed, if a decree awarding a lump allowance is as much subject to change as is an order that maintenance shall be furnished by periodical payment, it is difficult to understand why the lump allowance should ever be sought or granted. As said in *Narregang v. Narregang,* 31 S. D. 459 (139 N. W. 341):

"If it were not expected that there would be a final termination of the rights and obligations of the parties, so far as the support of the wife is concerned, we doubt if any court would ever grant a gross allowance."

2-c

There is a long line of decisions, including *Spain v. Spain,* 177 Iowa 249, to the effect that, whatever be the statute, there can be no modification giving the applicant an allowance of permanent alimony where, in the original decree, *no* alimony was allowed. See *McFarlane v. McFarlane,* 43 Ore. 477 (73 Pac. 203); *Cody v. Cody,* 47 Utah 456 (154 Pac. 952, 954); *Spain v. Spain,* 177 Iowa 249; *Cullen v. Cullen,* 23 Jones & S. (N. Y.) 346; *Bassett v. Bassett,* 99 Wis. 344 (74 N. W. 780); *Henderson v. Henderson,* 64 Me. 419, 420. Is there a difference between the standing of a judgment which refuses to make any allowance for alimony and one which allows but a small part of what is

claimed? Is not the refusal to allow the larger part an adjudication that not more is due than is awarded? If it be sound doctrine that, where there is no allowance of permanent alimony, the refusal is final and *res adjudicata*, unless reversed on appeal, it would seem to follow this should, on reason, be so where a large amount is claimed for permanent alimony, and but a small allowance is made. It would seem that such decree, in denying what is denied and allowing what is allowed, as much adjudicates finally that no more than the amount allowed is due as does a total refusal adjudicate that nothing is due. See *Narregang v. Narregang,* 31 S. D. 459 (139 N. W. 341).

III.  Our own statute provides that, when a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right. And subsequent changes may be made by it in "these respects," when circumstances render them expedient. The *Narregang* case was decided under an identical statute.

In *Guess v. Smith,* 100 Miss. ·457 (56 So. 166), there was a decree of absolute divorce; temporary and permanent alimony were commuted to a gross sum of $250, and decreed to be paid at once; and execution was awarded, should there be failure of payment. The statute provision on which a modification of permanent alimony was declined was this:

"When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody, and maintenance of the children of the marriage, and also touching the maintenance and alimony of the wife, or any allowance to be made to her, and may, if need be, require sureties for the payment of the sum so allowed; *and the court may afterwards, on petition, change the decree, and make from time to time such new decrees as the case may require."* Section 1673, Mississippi Code of 1906.

The court declares that the statutes of New York and of Illinois are substantially the same as the Mississippi statute, and that what it holds has been held in those jurisdictions. In *Kerr v. Kerr,* 59 How. Pr. (N. Y.) 255, $1,800 was allowed for the "wife and maintenance of her three children." Modification

except as to the children was refused. In *Gane v. Gane,* 14 Jones
& S. (N. Y.) 218, it was held that an allowance of $800 will not
be modified by so much as adding that, unless security for its
payment was given, the husband should be held to be in con-
tempt of court. In *Shaw v. Shaw,* 59 Ill. App. 264, it was held
that, as to whatever was a gross allowance of alimony, and even
though the statute permits new orders as to "allowance of ali-
mony and maintenance, and the care, custody, and support of
children," such gross allowance is in full discharge and satis-
faction of all claims for future support; and that there could
be no modification of such decree at a subsequent term. To like
effect is *Barkman v. Barkman,* 94 Ill. App. 440, and *Cole v. Cole,*
142 Ill. 19.

Section 5351, Cobbey's Annotated Statutes of Nebraska is:

"After a decree for alimony or other allowance for the
wife and children, or either of them, and also after a decree for
the appointment of trustees to receive and hold any property
for the use of the wife or children, as before provided, the court
may, from time to time, on the petition of either of the parties,
revise and alter such decree respecting the amount of such ali-
mony or allowance, or the payment thereof, and also respecting
the appropriation and payment of the principal and income of
the property so held in trust, and may make any decree respect-
ing any of the said matters which such court might have made
in the original suit."

It was held in *Beard v. Beard,* 57 Neb. 754 (78 N. W. 255)
(the syllabus being by the court):

"Where, in a divorce proceeding, a decree is entered dis-
solving a marriage, and awarding the wife a judgment against
the husband for $...... in full of all her claims upon him or his
property by reason of their former marriage relations, it seems
that the courts have no jurisdiction to vacate or modify such a
judgment, after the term at which rendered, solely because of
a change in the circumstances, financial or otherwise, of either
of the parties thereto. Such a judgment is a judicial determina-
tion of the share of the husband's property to which the wife is
entitled as permanent alimony, and is final and conclusive, unless
modified or vacated in a direct proceeding."

It is expressly added that said statute provision does not

apply "to such a judgment as mentioned above, but to an award for alimony payable so much weekly, monthly, etc., until the further order of the court."

It would seem that these are sustainable only on the reasoning that the money judgment is a commutation of what would be required for future support if the marriage relation had not been severed, and that such gross allowance is not alimony, in the technical sense, but is a sequestration, by way of provisions to take care of the new status with reference to support that would have been given had the status not been altered: in other words, that, even on statutes more plenary than our own, the courts are not empowered to amend as to gross allowances termed alimony or permanent alimony.