INTERNATIONAL MILLING COMPANY, INC., appellee, v. LAWRENCE I. GISCH et ux., appellants.

No. 51718.

(Reported in 137 N.W.2d 625)

64

OCTOBER 19, 1965.

Winkel & Winkel, of Algona, and Alan Loth, of Fort Dodge, for appellants.

Linnan, Lynch & Straub and Hutchison & Andreasen, all of Algona, for appellee.

SNELL, J.—This is an appeal by defendant-counterclaimant from judgment following a directed verdict against him.

The case was previously before us on different issues. See

International Milling Co., Inc., v. Gisch, 256 Iowa 949, 129 N.W. 2d 646.

Plaintiff sued in equity on a series of 57 notes and to foreclose a chattel mortgage. Defendants answered and counterclaimed at law for damages alleging fraud.

Nina M. Gisch, named as a defendant, is the wife of defendant Lawrence I. Gisch. No claim of personal liability was made against her. Lawrence I. Gisch will be referred to as defendant. The issues here involve his counterclaim.

Defendant is a farmer and for several years prior to 1961 had been a turkey raiser.

Nineteen sixty-one was a disastrous year in the turkey business. This case is an aftermath.

Plaintiff, International Milling Company, Inc., furnishes turkey poults, feed, supplies and financing for raisers. For some years plaintiff, through its representative, and defendant had done business with each other and did so in 1961. Plaintiff furnished turkey poults and extended credit to defendant. For the year 1961 a chattel mortgage secured the credits advanced to defendant.

As credits were advanced for and during the 1961 season defendant signed written instruments on forms furnished by plaintiff. These instruments were entitled "Delivery Invoice and Promissory Note; Turkey Financing." Among the provisions therein was a promise to pay.

On July 10, 1962, plaintiff sued in equity on notes aggregating $37,649.99 and sought foreclosure of its chattel mortgage. This was apparently the deficiency or loss from the 1961 turkey raising venture.

Defendant admitted the execution of the notes and the amount shown due thereunder. Plaintiff's chattel mortgage security was not disputed as to the items specifically described therein.

Defendant's counterclaim alleging fraud and asking damages resulting therefrom was transferred to law and separated for trial to a jury.

Prior to 1961 defendant had raised turkeys for several years and had done business with plaintiff through Mr. R. C. Johnson,

plaintiff's representative. Under their program plaintiff furnished the birds, feed, medicine, supplies and insurance. Defendant furnished the labor, equipment, shelter and some grain. When turkeys or eggs were sold plaintiff was paid first.

The 1958 operation lost over $32,000 because of disease and bad weather. Before the 1959 operation began Mr. Johnson and Mr. Ed Thompson, another International representative, met with defendant. Defendant testified:

"I said to Ed: 'What do we do now? Here we have a large account and no turkeys.' Ed says: 'What can we do? We don't want the equipment. You got into it with turkeys; you can get out of it with turkeys. This is a joint enterprise. You grow the turkeys; we'll feed and finance them. Time, Larry, heals all wounds.'"

During 1959 and 1960 through the turkey operation the debit balance was reduced to $9425. This was carried over to the 1961 operation.

On October 31, 1960, defendant and Mr. Johnson talked about plans for 1961. After some conversation defendant signed an "Application and Turkey Finance Agreement", a financial statement, and the first of the 57 notes held by plaintiff. On December 16, 1960, a chattel mortgage to secure the payment of the notes was executed and delivered.

Each of the notes was on the following form:

"SUPERSWEET Feeds

"Division of International Milling Company

"DELIVERY INVOICE AND PROMISSORY NOTE
(TURKEY FINANCING)

NOTE No._____

Customer's Name L. I. Gisch Date _____ 1961

Address Algona, Iowa

Sold by International Milling Co. Address LeMars, Iowa

| Date of Purchase or Advance | Invoice No. | Description of Property Purchased or Monies Advanced | Price | Amount |
|---|---|---|---|---|
| | | | | |

Total_____

"Gentlemen: The above described feeds and supplies have been pur-
chased and received and accepted by me in good condition, and this invoice
is correct as to the price and amount. I hereby authorize you to pay
International Milling Co. for which I have signed the promissory note
hereinafter set forth: which is secured by the chattel mortgage(s) upon
my turkeys and held by you. For value received, we promise to pay on
demand to the order of International Milling Company, Minneapolis,
Minnesota, the sum of _____ Dollars ($_____)
with interest on each amount specified above from the respective date
of purchase or advance specified above, at a rate of six percent (6%)
per annum until paid.

F-242 Rev. 1/61

"/s/ L. I. Gisch, Jr._____
"Customer's Signature"

The mortgage was for $1.00 and other consideration. It
located the property and covered 29,000 Bronze turkeys together
with all other turkeys, eggs, poults, feed and grain furnished by
mortgagee and all turkey brooder houses, range shelters, feed,
watering and all other turkey raising equipment of mortgagor.
The mortgage was quite extensive in its provisions and gave the
mortgagee substantial authority and contained a denial of re-
sponsibility. At the end of a long 186-word sentence in the
middle of the second paragraph of provision 3(j) these words
appear: "The Mortgagor to remain liable for any deficiency."

It appears without question and it is admitted by defendant
that the papers signed by defendant make him personally liable.
Defendant claims that there is fraud because the papers do so.

Relative to the October 31, 1960, conversation defendant
testified:

"Mr. Johnson gave me some of these, and I sat there looking
at it and said, 'Ole, what is this paper?' and he said, 'It's a
delivery receipt for goods to be financed by the LeMars office,
as to amount and; as to what it is.' And I said: 'But, Ole, it
says it's a promissory note. Does that make me personally li
able?' And Ole said, 'No, it doesn't make you personally liable
over and above your turkeys and your turkey equipment; that's
all you can lose.' Well, he says: 'Larry—just read this. It says:

"Promissory note hereafter set forth." Now, "promissory" means promise to pay, which is secured. Now "secured" means guaranteed—if you don't believe me, look in Webster's dictionary—by a chattel mortgage upon my turkeys and held by you. Now, the way you read this is: "I promise to give my guarantee, which are my turkeys"; and that's all you are promising to give.'"

Defendant also testified relative to a conversation on December 16:

"Yes, we were talking about the number we were going to raise, 1800 breeder hens, with a working agreement with the hatchery that we would take back 20 poults per hen. In other words we sell eggs to them. We guaranteed to take back 20 poults per hen, and they would sell the rest of them. I had already housed 1800 hens so I was obligated to pay back 36,000. Now, they had also told me if I could peddle some of these to somebody else to fulfill my obligation I could. I'd have to peddle them and come to whatever figure it would be. * * *

"At this meeting at my house there was a representation whether my liability would extend beyond those 29,000 turkeys and the turkey raising equipment. My brother, John, there was quite disturbed at this number of 29,000 turkeys. So he asked Johnson: 'If it's a bad turkey year, will Larry lose his farm?' Mr. Johnson says: 'No, it doesn't say anything here about land. The only thing he is giving—the only thing he can lose—are his turkeys and turkey equipment.' I had read a chattel mortgage like this one in the past. I was familiar with its provisions. I signed it, and my wife did too. Before we signed it, Johnson said that 100% financing would be forthcoming, for both the breeding flock and the growing flock. I believed these representations Johnson made October 31 and December 16, 1960. I believed everything he told me at that time, because I had never been crossed up. When he told me something was going to be this way, that's the way it was. Nobody other than Johnson ever told me any different. I did rely on his representations that there would be no liability over and above the turkeys and turkey raising equipment mentioned in the chattel mortgage. I would not have entered into this program in 1961 if I had known there would be a claim of personal liability against me, above the turkeys and equipment. * * *."

This evidence over the objection of plaintiff was admitted only for the purpose of showing fraud.

During the 1961 season as periodic deliveries were made to defendant he signed the 57 notes held by plaintiff. Each note was for the individual invoice.

The 1961 season was disastrous. Prices were low. Defendant testified:

"On October 17 Johnson asked me to Fairmont. Mr. Hanson said how much money was involved in turkey business; how much Supersweet had borrowed to get into it and how much loss there would be because of low prices. After about half an hour I said: 'Joe, what are you trying to say?' He said, 'If we are going to finance you in the future, we will want a real-estate mortgage.' I said 'I am not going to give it.' I went home. On the way, Johnson caught up with me at Swea City. He said 'Those guys are riding you. They know how I sold this to you; how you bought it. If you give them one nickel more than your turkeys and turkey equipment, you're crazy.' I said, 'I don't intend to.' He told me they were asking me for more financing because I was one of their better accounts and had for years been their good customer, and they held this up in front of everybody else and 'Now if they can get Larry Gisch to give them a real-estate mortgage, they can sell it to the rest.'"

A letter to defendant by J. R. Hanson, director of credit for plaintiff, refers to the visit of October 17, expresses appreciation for past association, mentions the setback in the turkey industry, the need for additional security and that the company had decided "anticipating a large deficit at the end, to require a real-estate mortgage on Gisch's home place 'to secure the carry-over if we are to finance your 1962 program.' 'The chattel mortgage security available in the past is unsatisfactory,' because of the anticipated deficit and the large capital required to handle Gisch's 1962 breeder and growing programs."

Defendant refused to give the additional security. The year's operation was prematurely closed out with over $38,000 loss.

The substance of the conversations with Johnson was corroborated by defendant's wife; John Gisch, a brother; Lee

Schenck, a farmer who was present; Mrs. Schenck, who testified as to assurances given her by Mr. Johnson; and Mr. Bartlett, who told of assurances given him.

Defendant also offered testimony of Mr. Bartlett as to statements of Mr. Johnson about a newspaper article. This testimony was not received.

We think there is some significance in the fact that plaintiff asked for more security for the first time when financing for 1962 was being considered. Neither prior thereto, then, nor until much later, was there any claim that defendant was personally liable for any deficit.

 I. The trial court properly admitted oral testimony to prove fraud. It is well settled that parol evidence is admissible to prove fraud. The admission of evidence for this purpose is not in conflict with the parol-evidence rule which renders such evidence inadmissible to contradict or vary the terms of a written contract. Parol evidence is admissible to prove fraud that induced the writing. Bales v. Massey, 241 Iowa 1084, 1090, 43 N.W.2d 671; Lamasters v. Springer, 251 Iowa 69, 73, 99 N.W.2d 300; Scheel v. Superior Mfg. Co., 249 Iowa 873, 880, 89 N.W.2d 377.

 "* * * where there is evidence of fraudulent misrepresentations in the inception of a contract such misrepresentations can be the basis for * * * an action * * * for damages, despite the limiting provisions of a contract." Hall v. Crow, 240 Iowa 81, 88, 34 N.W.2d 195.

 Admission of testimony of similar statements made to a neighbor while negotiating a similar contract is proper, when properly limited, as bearing on the question of design or plan. Hall v. Crow, supra, loc. cit. 91.

Judge Henry N. Graven in Nutrena Mills, Inc. v. Yoder, 187 F. Supp. 415 (a turkey raising case), thoroughly analyzes the law and holds certain oral testimony inadmissible but that was a contract and not a fraud case and is not controlling here. The question of damages is not before us here but the cited case on appeal, 294 F.2d 505, indicates certain limitations thereon.

Farmers Mutual Hail Insurance Co. of Iowa v. Fox Turkey Farms, Inc., 301 F.2d 697, a turkey insurance case, holds that the

parol-evidence rule, a rule of substantive law and not a rule of evidence, requires in the absence of fraud, duress, mutual mistake or something of the kind, the exclusion of extrinsic evidence, oral or written, where the parties have reduced their agreement to an integrated writing. The case does not hold that parol evidence may not be heard to establish fraud.

II. A simple promise of future conduct is not a representation of an existing fact and as such, in the absence of conditional delivery, does not constitute fraud. A contemporaneous parol agreement not to hold the maker of a note personally liable thereon does not constitute fraud in the inception of the note. Smith v. Breeding, 196 Iowa 670, 195 N.W. 208.

In the case at bar the trial court relying on this case held that there was no competent evidence of fraud in the record.

We adhere to the holding in the Smith case and other holdings of like import but they are not controlling here. From the evidence a jury might find the statements in the case at bar were more than an expression of opinion; that they were intended to state facts to be relied on as such. The statements did not relate to a right under the instruments that the plaintiff might or would waive in the future. They noted as facts the limits of plaintiff's rights under the instruments.

"Ordinarily the question of whether the representations made are opinion or fact is for the jury to determine and depends upon the facts and circumstances in each case." Christy v. Heil, 255 Iowa 602, 608, 123 N.W.2d 408; Syester v. Banta, 257 Iowa 613, 626, 133 N.W.2d 666, 674.

III. A false promise may constitute fraud when made for the purpose of deceiving the party to whom made and when the latter justifiably relies thereon. Commercial Savings Bank v. Kietges, 206 Iowa 90, 98, 219 N.W. 44.

False representations as to the law may constitute assertions of fact and if untrue constitute fraud. Schneider v. Schneider, 125 Iowa 1, 14, 98 N.W. 159.

It should be kept in mind that there is a distinction between a misunderstanding as to the law and false assertions of fact.

In Upton v. Tribilcock, 91 U. S. 45, 50, 23 L. Ed. 203, 205, it is said: "That a misrepresentation or misunderstanding of the

law will not vitiate a contract, where there is no misunderstanding of the facts, is well settled."

In Mutual Life Insurance Co. v. Phinney, 178 U. S. 327, 20 S. Ct. 906, 44 L. Ed. 1088, a case involving an insurance contract, it was held that an expression of opinion which is a matter of law cannot constitute false representations or deceit.

A mere statement of an honest opinion, as distinguished from an assertion of fact will not amount to fraud, even though such opinion be incorrect. When the statements become representations of fact or the expression of opinion is insincere and made to deceive or mislead they may be treated as fraudulent. Whether such is their quality and character is ordinarily a jury question. Owens v. Norwood-White Coal Co., 188 Iowa 1092, 1117, 1118, 174 N.W. 851. See also Lamasters v. Springer, supra, loc. cit. 72 of 251 Iowa; Scheel v. Superior Mfg. Co., supra, loc. cit. 884 of 249 Iowa.

IV. In the case at bar defendant read the papers he signed and questioned the meaning. He testified as to assurances of limited personal liability and reliance thereon. The fact that he was alerted and then reassured does not as a matter of law preclude recovery for damages sustained as a result of false representations. This is ordinarily a question for the jury. Christy v. Heil, supra, loc. cit. 607 of 255 Iowa.

V. If representations relied upon refer to existing facts as distinguished from representations which are wholly promises of future performance a cause of action may rest thereon. Lee & Son Co. v. Sundberg, 227 Iowa 1375, 1379, 291 N.W. 146.

In the case at bar a jury might find that statements attributed to plaintiff's agent were intended as statements of existing facts and not to promises as to future action.

In Baker v. Bockelman, 208 Iowa 254, 258, 225 N.W. 411, we said: "* * * It is the settled law in Iowa that one who asserts as a fact, without qualification, something that he does not know to be true, asserts, by implication at least, that the thing asserted is of his own knowledge, and true; and he is not permitted, as against one to whom the representation is made, as an inducement to act, and who is thereby induced to act, to thereafter assert that he did not know his statement to be false."

VI. Plaintiff-appellee argues that an agent has no authority to alter the terms of a written contract of his principal.

We do not find that the agent's authority was an issue below, included in plaintiff's motion for directed verdict or mentioned in the court's ruling thereon. A directed verdict will not be upheld on a ground not asserted in the trial court. Bartels v. Cair-Dem, Inc., 255 Iowa 834, 845, 124 N.W.2d 514.

We need not discuss this proposition except to note that if there was fraud it was by plaintiff's own agent and for it plaintiff is responsible. Turner v. Zip Motors, Inc., 245 Iowa 1091, 1096, 65 N.W.2d 427, 45 A. L. R.2d 1174, and citations.

There was also evidence of participation and knowledge of the account and transactions by other representatives of the company.

Here the alleged assurances by plaintiff's agent did not relate to what the contract to be prepared in the future by the principal would contain. This is not an action for reformation of a contract as in Cox v. Pabst Brewing Co., 128 F.2d 468, cited by plaintiff.

VII. In September 1962 after this lawsuit was started a local newspaper printed an account of the claims of the parties. In setting forth the claim of defendant the article included these statements: "Defendant states in the counterclaim that he relied on plaintiff's advice, assistance and good faith in financing and transacting such turkey business. That plaintiff had orally and frequently agreed that it would not claim any rights in or against any other real or personal property not connected with the turkey business. When the mortgage was signed, plaintiff orally represented and assured defendant that it would be limited to the security aforesaid and would entail no personal obligation on his part beyond that security."

Defendant called as his witness Mr. Bartlett, a turkey raiser and feed salesman. Mr. Bartlett testified that he talked with Mr. Johnson about this article. He was asked: "Q. Did he say anything about the truth or falsity of the article?" This was objected to as follows: "Object to it as wholly immaterial and irrelevant; in no way binding on plaintiff-company, incompetent, having no bearing whatever on the issues in this case."

The objection was sustained. Defendant then offered to prove "by this witness who would testify that R. C. Johnson, a representative of International, acknowledged that the article, Exhibit L, stated the truth in regard to the manner in which International, and particularly R. C. Johnson, represented the feeding program and the turkey matter to Larry Gisch. This is offered as an admission by plaintiff that the feeding program was, in fact, sold in that manner, specified in the article. In offering this testimony, the article itself explains the manner in which Gisch testified these matters were represented; it's an admission to Johnson on their behalf that those are the facts that existed in regard to Gisch's notes, mortgages and feeding program."

The newspaper article was offered. Neither the article nor the testimony was received.

Defendant argues that such evidence was admissible.

As we have indicated in Division VI we do not think Johnson's authority or plaintiff's responsibility was successfully challenged as a matter of law. A jury could find that Johnson's acts and statements were chargeable to plaintiff.

The offered evidence was admissible.

It is well settled that admissions against interest are generally admissible. In Robinson v. Fort Dodge Limestone Co., 252 Iowa 270, 278, 106 N.W.2d 579, we quoted from Barish v. Barish, 190 Iowa 493, 180 N.W. 724, as follows: "'* * * any admission against interest must be received, if relevant, whether it be found on a transcript or upon a pine shingle.'"

We considered the propriety of admitting statements made by an agent and held them admissible and in support of plaintiff's allegations. See also McCrady v. Sino, 254 Iowa 856, 862, 118 N.W.2d 592, and Katcher v. Heidenwirth, 254 Iowa 454, 466, 118 N.W.2d 52.

VIII. The only problem before us is the sufficiency of admissible testimony to generate a jury question.

In considering the propriety of a directed verdict against counterclaimant we give his evidence the most favorable construction it will reasonably bear. Citations unnecessary. See rule 344(f)2, Rules of Civil Procedure.

When so considered there was a case for the jury.

The case is reversed and remanded for a new trial.—Reversed and remanded.

CHIEF JUSTICE GARFIELD and JUSTICES LARSON, THORNTON, MOORE, MASON and BECKER concur.

JUSTICES RAWLINGS and STUART dissent.

RAWLINGS, J.—I respectfully dissent. The conduct of plaintiff may be classified as a high-handed business method and it may shock our sense of fair play and morality, but such alone does not serve to make it a fraudulent transaction.

The defendant-counterclaimant had been in the turkey business for years and was neither illiterate nor incompetent. He read the contract, was never precluded from so doing, and in fact asked several pointed questions about some material portions before signing. He should not now be heard to effectively cry fraud as to that which was well known to him before he affixed his signature to the agreement.

As was said in Short v. Martin, 255 Iowa 189, 193, 121 N.W. 2d 154, where the parties are competent to contract and do so freely at arm's length, it is not for the court to act as a post transaction guardian for either party.

Going back to Indianapolis Terra-Cotta Co. v. Murphy, 99 Iowa 633, 68 N.W. 898, it was there made clear all preliminary verbal discussions merge in a written pact.

Then in Lillie v. Shriver, 190 Iowa 861, 864, 179 N.W. 632, this court said, if through a false representation of the contents of a paper one signs without reading it and nothing has been done working a prevention of the reading of the instrument, then, though it be assumed the contents were falsely represented, the party who signs without reading must accept the consequence of his own folly. By the same token he is bound if he reads and then signs. See also Crum v. McCollum, 211 Iowa 319, 233 N.W. 678.

We are here dealing with a written contract, clear and certain in its terms, and a claim of fraud-inducing execution. There was no actionable fraud in this case. Rather there were representations by one layman to another as to the meaning or legal

effect, the intent or purpose of the terms of a written agreement. This was at best an opinion as to what might happen in the future. 17 C. J. S., Contracts, section 158, page 918.

The fact is defendant-appellant tried to act as his own counsel and as a result of false economy or lack of foresight entered into a written compact which went sour and he now complains.

The opinion is contrary to established principles in the field of contracts as disclosed by the relevant authorities set forth in Nutrena Mills v. Yoder, 187 F. Supp. 415, 423–429, affirmed 294 F.2d 505 (8 Cir.). In fact this case and Farmers Savings Bank of Slater v. Weeks, 209 Iowa 26, 227 N.W. 508, stand on comparable legal territory. In the cited case the testimony was to the effect the representatives of plaintiffs, who solicited a mortgage, assured the husband and wife they did not want the property, they would indefinitely extend time of payment, and would never take the personalty to be encumbered. We there said such inducing statements were not representations of existing facts, but were only promises of future action. We there went on to say, such representations were contradictory to the written provisions of the instrument and not admissible in evidence. Such is the stuff of which our parol-evidence rule is made.

I would follow this line of authority, and affirm.

JUSTICE STUART joins in this dissent.