COMMERCIAL SAVINGS BANK OF CARROLL, Appellant, v. P. C. KIETGES et al., Appellees.

APRIL 3, 1928.

REHEARING DENIED JUNE 26, 1928.

*Helmer & Minnich* and *O. D. Nickle,* for appellant.

*Jepson, Struble, Anderson & Sifford,* for appellees.

MORLING, J.—The action is upon a guaranty dated January 23, 1920, of all notes discounted by the Danbury Trust & Savings Bank to plaintiff, the Commercial Savings Bank of Carroll, "with or without recourse, said bank now holding $130,000 of paper made to the Danbury Trust & Savings Bank, which we do hereby guarantee and further guarantee all notes discounted in the future endorsed by Danbury Trust & Savings Bank without recourse."

The guaranty is signed by four directors of the Danbury Trust & Savings Bank: Braig, Dumig, Kietges, and Berger. Dumig is dead. His administrator and Kietges defend for fraud. Plaintiff's main contention is that the false representations claimed consist of a promise and legal opinions. The substance of the fraud claimed is that plaintiff, holding some $100,000 of the rediscounted paper of the Danbury bank, indorsed by the Danbury bank without recourse (the indorsement without recourse being unknown to defendants) represented, through plaintiff's cashier, Moehn, and Vice President Neu, to defendants, that the Danbury bank and defendants were liable on all of the paper; that, unless defendants signed, they would close the bank and sue the directors; that guaranty was demanded by the banking department, and was a mere matter of form, on which there would be no liability. There was the further false representation claimed, that defendant Kietges wanted to telephone the president of the bank, a confidential adviser, and get his advice, and was thereupon told by Moehn that he had already talked with Braig, and Braig had said it was all right for him to sign the guaranty. As the sufficiency of the evidence to go to the jury must be considered from the standpoint most favorable to the defendants, we do not undertake to set out opposing or inconsistent statements of the witnesses, as would be necessary if we were weighing the truthfulness of their testimony.

Berger had been cashier of both the Danbury and Carroll banks. While such, he had taken for the Carroll bank a large amount of the paper of the Danbury bank, indorsed by the Danbury bank without recourse. In 1919, Berger was succeeded as

cashier of the Danbury bank by Brenner, and as cashier of the Carroll bank by Moehn. The new cashier, Moehn, found that the Carroll bank had about $100,000 of paper of the Danbury bank, indorsed without recourse. Moehn testifies:

"After Mr. Berger left, I had no way of knowing what the paper was that came over from Danbury. Under that situation, I took the matter up with our board, and we decided Mr. Neu and myself were to go down and make some arrangement with the Danbury bank, or its directors, if we were to continue this arrangement of taking new paper, additional paper, under the same plan that we had previous. * * * As long as Mr. Berger was there, he knew everybody in Danbury, and was able to pass on whether it was good or bad paper. * * * We talked to Mr. Brenner, the cashier. We told him we wanted to see the board of directors. * * * I think it was around 2:00 o'clock when Mr. Kietges came up. * * * I explained to him that I had bought the bank there at Carroll; that the paper that they were sending to me, I knew nothing about; that, if I was to continue to take their customers' notes, that I wanted the board of directors to O. K. them for me, to guarantee that they were sending me good notes. I couldn't reasonably be expected to take notes that I didn't know anything at all about, and credit the account for it, with an indorsement without recourse on the paper; and the directors and the cashier assured me that we had good paper; and I remember distinctly saying to them that, if the paper is good, that this guaranty will not hurt you, because all I want to do is to have something in writing, that I know that these notes are good. * * * It is only in the event that a note wouldn't be paid that there would be any liability at all on the guaranty. * * * That, as fast as they could liquidate this paper, we wanted the liquidation made, but we would continue to take their paper back and forth * * * If they wouldn't do that, there is only one other thing that I could do, and that is, when the notes came due, was to collect them direct from their customers; and they didn't want that done. * * * I didn't see why our institution should suffer a loss on the Danbury paper. * * * I didn't have a list of the notes. Mr. Brenner had a list * * * but we didn't want to take the time to go over the notes and find out how many there was there, so we estimated that there wasn't much over $106,000, or $110,000,—something like that; but, in order to cover the

entire amount of notes, * * * we stipulated in the contract that it was not to be more than $130,000. * * * The only suit I remember of referring to in the way of suit was that we would have to sue the makers of the note,—not sue the bank or the board of directors. * * * because they were our paper, and indorsed to us without recourse. I couldn't have done anything else but sue the makers of the note. * * * I did not tell them, in words or substance, that I was going to sue the bank or the stockholders of the bank. * * * What was said in regard to there being no liability on it was to the effect that, if the notes we held were paid by the makers, there would be no liability on the guaranty. * * * There was talk there at that time about the paper, being signed without recourse. All the paper I held was indorsed without recourse. * * * The department had told us the old ones [notes] had to be paid, or if new ones were taken, we had to have security. * * * I received from Mr. Berger and from other parties from whom I purchased my interest in the Carroll bank a guaranty of all the paper that was in the bank.''

Brenner testified that, when Moehn and Neu came into the bank, they advised him of their purpose.

''It seems to be my recollection that there was some conversation by Mr. Moehn or Mr. Neu that the bank was liable on this paper. I remonstrated, and told them I knew the paper was indorsed 'without recourse.' They agreed that it was indorsed without recourse. I believe this conversation with Neu and Moehn was prior to the time Mr. Kietges was at the bank. * * * The nature of their remarks, as I remember it, was that Mr. Neu told Mr. Dumig that it was a matter of the banking department, demanding a guaranty of some kind, in order to satisfy the department. That nothing would come of it, and it was just a matter of form. * * * Mr. Moehn * * * said he wanted a guaranty, and the banking department demanded it from him. * * * I think Mr. Kietges and Mr. Dumig didn't want to sign the guaranty, at first. Mr. Moehn then said he would be compelled to put an attorney at the door, and that meant closing the bank. * * * I believe he told Mr. Kietges that he would be compelled to sue each and every individual there. I think Mr. Dumig was also there at the time that remark was made. Mr. Moehn, in response, then said that, if the guaranty was not given, he would

be compelled to sue each note as it became due. I didn't want that, for they were customers of ours, scattered right round Danbury. * * * I think I kept my hands off. It was none of my business.''

There is a suggestion, unconnected with defendants' knowledge, that Berger did not want the Danbury bank books to show a rediscount liability.

Dumig was 74 years old, German-born, a retired farmer, leaving an estate of about $28,000, spending a good deal of his time ''loafing'' about the bank. He held $200 of the stock. Kietges was formerly a carpenter. He had organized and was conducting a lumber company, on an authorized capital of $15,000. He also had $200 of the bank stock. He was about 65 years old at the time of the trial. Kietges testifies that he never paid much attention to the bank, and never knew anything about it; that there were other directors and stockholders who had larger interests, and looked after its financial affairs; that he did not ''understand bookkeeping or anything of that sort. They never asked me to go over the books of the bank.'' He was called to go over to the bank when Moehn was there, and refused; but, after urging, went there about 2 o'clock.

''They asked me to sign a guaranty. I told them I didn't want to do it; that I couldn't afford to take any chance of signing anything, for what little I had in the bank; that I had a big family * * * I knew nothing about the amount of paper that they held. When I refused to sign, they told Mr. Dumig and myself that we were liable, and that it would be better for us to sign it; that they would never make any trouble, in case it couldn't be collected. They told us we were personally liable, and furthermore would close the bank if something wasn't done, and if we did not sign it. They said the bank was personally liable, too. I did not know whether these notes were indorsed with or without recourse. They did not have the notes there. * * * When they told me that I was liable on this paper, and that the bank was liable on it, I did not know whether I was or not. I did not know whether the bank was. I believed them, and relied on what they told me. They said they wanted to satisfy the bank examiner, and make a showing. They said, if we would sign, we would never have any trouble, or would never

be sued; and if we did not, they would start to make us trouble. * * * I said I would like to hear from Mr. Braig before I signed it. They said they had already called him, and he said it was perfectly all right for me to sign the agreement. They said Mr. Moehn had called Braig. * * * I believed them, and relied on what he said. * * * I went up there at about 2:00 o'clock, and about four hours transpired before I and Mr. Dumig were actually induced to sign Exhibit A. * * * I knew the difference between signing without recourse and signing with recourse.''

Kietges thought he and Dumig were removed as directors in September, 1921. He further testifies:

"Moehn * * * explained why he wanted that guaranty,—to satisfy the state examiner was the main thing, and that they had to do something; that they had too much of the Danbury paper there,—which I didn't know,—and the state bank examiner had asked Moehn · to get it secured. That was the main reason he came up. * * * Q. You knew that the only way that you could be liable on those notes, was if you had indorsed those notes with recourse? A. I did not know, as a director of the bank. I knew that, if I had signed without recourse, he couldn't make any trouble. * * * Q. When Mr. Moehn told you that he was going to make you trouble,—that you was liable on the notes,—you knew that you couldn't be liable if the notes were signed without recourse? A. I didn't know that,—no, not as a banker,—no, not concerning a bank. I didn't know whether we were liable or not, as directors. * * * Q. You knew that the bank couldn't be liable if it was signed without recourse at all, as such, didn't you? A. I think so. Q. So that the only thing that you was afraid of was that he was going to hold you as a director? A. Yes, sir. * * * Q. You say that his saying that he was going to make you trouble, under the facts that you have just testified to, was one of the things that caused you to sign this agreement? A. That is one of them, yes. I don't know that I asked our cashier as to whether I could be held individually, but I asked him his advice whether I should sign the guaranty, and he told me I had better sign it. * * * I wanted to get off, the next morning, and they wouldn't let me. I told Mr. Brenner.''

There was a motion to direct, at the close of defendants'

evidence. Plaintiff, however, on its being overruled, went on with the case; and the question before us is the correctness of the ruling on renewal of the motion at the close of all the evidence.

It is said in 1 Page on Contracts (1st Ed.), Section 166, that the reason usually given for the rule that false statements concerning the law do not constitute fraud "is that everyone is presumed to know the law; but this proposition is applicable chiefly to criminal law; and, as we shall see later, does not always apply in civil matters. The real reason for the rule is that; where the material facts are known, and the parties are on terms of equality, law is a matter of opinion, and everyone must know that it is."

A charge of fraud cannot be successfully based upon a mere expression of opinion. On the other hand, one may not be relieved from responsibility for fraud because, in making a misrepresentation which would otherwise be fraudulent, he has chosen to make it in the form of an opinion. If the representation, instead of standing alone, or by itself as an opinion, which, under the circumstances, must be understood to be such, is intended to be an affirmation of fact, and to be so understood, and the circumstances are such that it may properly be, and is, so accepted, the other essential elements of fraud being present, it will sustain the charge of fraud. *Hetland v. Bilstad,* 140 Iowa 411; *Schwitters v. Des Moines Com. College,* 199 Iowa 1058; *Scott v. Burnight,* 131 Iowa 507; *Owens v. Norwood-White Coal Co.,* 188 Iowa 1092; *Dashiel v. Harshman,* 113 Iowa 283; *Harris-Emery Co. v. Pitcairn,* 122 Iowa 595; *Boysen v. Petersen,* 203 Iowa 1073; *Haigh v. White Way Laundry Co.,* 164 Iowa 143 (50 L. R. A. [N. S.] 1091); *Aldrich v. Worley,* 200 Iowa 1009; 26 Corpus Juris 1062 *et seq.*; 12 Ruling Case Law 249 *et seq.*; 2 Pomeroy's Equity Jurisprudence, Section 878. If the facts are not equally within the knowledge of both parties, if they do not stand on a common footing of opportunity and knowledge, if the representor has the greater knowledge or means of knowledge, if the parties are not dealing with facts before them equally open and observable, if the representation, though in form in the nature of an opinion, is not sincere, but made with the purpose to deceive, the representor may be found to have represented by implication the existence of the facts necssary to

sustain the representation which he puts in the form of an opinion. Idem. Cases cited in 26 Corpus Juris 1086. This is true though the affirmation takes the form of an opinion of law. Idem. In determining the question, the relative position and advantage of the parties, their facilities for knowing the truth, their actual knowledge,—as said in *Boysen v. Petersen*, 203 Iowa 1073, "the vantage ground occupied by the representor," —the purpose of the representation, and the object sought to be attained, are important, and must be taken into account. Idem. The courts have never undertaken to lay down a hard and fast rule for determining what constitutes fraud. Except in rare cases, the question is to be determined from all the circumstances by the jury, as a question of fact, and not by the court, as one of law. *Owens v. Norwood-White Coal Co.*, 188 Iowa 1092; *Leach v. Central Trust Co.*, 203 Iowa 1060; *Hogan v. McCombs Bros.*, 190 Iowa 650; and cases above cited.

Here, the jury might reasonably have found that Moehn was intent on getting from defendants a guaranty, and of overcoming their opposition; that defendants did not know that the notes were indorsed without recourse; that they understood that the banking department was demanding the guaranty, but did not know the facts upon which such demand was being made; that Moehn made the representation for the purpose of inducing in defendants the belief that the bank and the directors were liable, and that the facts known to him were such as to make them liable; that the affirmations of Moehn could be, and were, reasonably construed, not as his mere personal opinion, but as an affirmation of the existence of such facts. The jury might find that Moehn knew that the facts were such that defendants were not liable, and that defendants, as Moehn understood, did not know such facts.

To illustrate, if Moehn had represented that a third person was liable upon a certain note, the one to whom the representation was made might readily understand that such person had, by his signature or by some other act, bound himself to pay the note.

As to the claimed statement that Moehn said they wanted to satisfy the bank examiner, and if defendants would sign, they would never have any trouble, or be sued,—that it was just a

98

matter of form, and nothing would come of it,—
the case does not rest upon a mere promise, not
incorporated in the writing, or a promise breach
of which does not constitute fraud. If, in making these state-
ments, Moehn was intentionally misrepresenting the then exist-
ing state of mind of plaintiff's officers, or if promise was made
with no intention on the part of plaintiff of performing it, but
for the purpose of deceit, and the statements were reasonably
relied upon, the jury, the other essentials being proved, might
find that such affirmation was fraudulent, though in form prom-
issory. *City Nat. Bank v. Mason*, 192 Iowa 1048, 1050; *Schwit-
ters v. Des Moines Com. College*, 199 Iowa 1058; *Sullivan v.
Gaul*, 198 Iowa 630.

Plaintiff argues that defendants were not only bound to
know the law, but that they were bound by the knowledge of
the cashier of the Danbury bank, who is referred to in plain-
tiff's argument as defendants' "servant" or
agent. Plaintiff says that defendants, as direc-
tors of the bank, are held in law to know the
facts which the corporate books and records disclosed.

"There is no rule of law which charges a director or stock-
holder of a corporation with actual knowledge of its business
transactions merely because he is such director or stockholder."
*Rudd v. Robinson*, 126 N. Y. 113, quoted in 3 Cook on Corpora-
tions (6th Ed.), Section 727.

See, also, *Folwell v. Miller*, 145 Fed. 495; *Washburn v.
Inter-Mountain Min. Co.*, 56 Ore. 578 (109 Pac. 382); 7 Ruling
Case Law 505.

Plaintiff here was dealing with defendants as individuals,
and procuring from them their individual obligation. Plaintiff
was demanding the guaranty, not as a corporate act, but to evi-
dence an individual liability. Plaintiff (it might be found)
knew the facts, and that by reason of them the defendants were
not liable. If defendants in reality did not know the facts, and
were deceived, there is no principle of law or morality which
should impute to them knowledge, and absolve plaintiff from
the consequence of its actual fraud.

Plaintiff urges that the guaranty, though secured by fraud,
was not void, but only voidable, and might be ratified by ac-

cepting the benefits, or by acquiescence; and that the right of rescission must be exercised within a reasonable time after the fraud is discovered, or by the exercise of reasonable diligence ought to be discovered. This argument has no application. Defendants' contract is promissory. They have received, and were to receive, nothing under it. The law does not require one who has been deceived into such a contract to notify the swindler that he has perpetrated a fraud. The defrauder acts at his own, not his victim's, peril in committing the fraud and in acting on the agreement procured thereby. The defendants may await the action of the defrauder and set up the fraud in defense, if suit is brought. *Ford v. Ott,* 186 Iowa 820; *Shores-Mueller Co., v. Knox,* 160 Iowa 340; 6 Ruling Case Law 636; 12 Ruling Case Law 154; 13 Corpus Juris 396; 28 Corpus Juris 925; 1 Page on Contracts (2d Ed.), Section 352; *Lex v. Selway Steel Corp.,* 203 Iowa 792.

"That the notes were procured by fraud rendered them voidable, not void; and, of course, it was optional with the maker whether or not he would challenge their legality. This he was not bound to do until the holders sought to enforce the collection, and then might interpose the defense that the notes were obtained by fraud, and were, in part, without consideration. Were the suit to rescind, and cause the notes and mortgage to be canceled, a different rule would obtain, and he must have acted promptly. See *Lundean v. Hamilton,* 184 Iowa 907. The defense of fraud, then, was available, unless waived. By waiver is meant the voluntary or intentional abandonment of a known right. * * * To constitute a waiver, two things are essential: First, there must be knowledge of the existence of the right; and second, an intention to relinquish it." *Ford v. Ott,* 186 Iowa 820.

Furthermore, Kietges testifies that he thinks Dumig and he had been removed as directors in September, 1921; that he did not know (and there is no evidence) that defendants knew that plaintiff was acting to its prejudice on the strength of the guaranty, or of defendants' non-action in respect to it, and no support of the plea of estoppel. Plaintiff suggests that the one-dollar recited consideration has not been returned. The guar-

anty acknowledged receipt of it. The testimony, though quite full as to what took place, contains no reference to the one dollar; and if it was received by defendants, the amount is so trifling that a failure to return it cannot be considered as a ratification. *De minimis non curat lex.* The motion to direct was properly overruled.

But the court instructed the jury:

"The false representations alleged to have been made by the plaintiff's officers and agents are that the Danbury Trust & Savings Bank was legally liable on the notes held by the plaintiff, and that the directors were legally liable on the notes held by the plaintiff bank. * * * You are instructed that an unqualified statement that a fact exists, made for the purpose of inducing another to act upon it, implies that the person who makes it knows it to exist, and that he speaks from his own knowledge, * * *"

The court, in effect, instructed that the representation that the bank and directors were liable was, in and of itself, a statement of fact. The court should have instructed on the subject of the difference between representations of matters of fact and matters of opinion or of law. *Schwitters v. Des Moines Com. College*, 199 Iowa 1058; 27 Corpus Juris 79.

For error in the instructions, the judgment is—*Reversed.*

STEVENS, C. J., and EVANS, ALBERT, KINDIG, and WAGNER, JJ., concur.